UNITED STATES of America, Plaintiff,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, et al., Defendants.

In re APPLICATION XXX OF THE INDEPENDENT REVIEW BOARD.

No. 88 Civ. 4486 (DNE).

United States District Court, S.D. New York.

Jan. 9, 1997.

Bernstein & Maffeo, L.L.P., New York City (J. Bruce Maffeo, of counsel), for Gene Giacumbo.

Mary Jo White, United States Attorney for the S.D. New York, New York City (Beth E. Goldman, Assistant United States Attorney, of counsel), for the U.S.

Independent Review Board, Office of the Chief Investigator, New York City (Charles M. Carberry, of counsel), for the Independent Review Board.

*OPINION & ORDER*

EDELSTEIN, District Judge:

TABLE OF CONTENTS

I. BACKGROUND .......... 1116

A. The IRB's Hearing and 1995 Opinion & Decision .......... 1118
1. The Charges Against Giacumbo .......... 1118
a. Charge One .......... 1119
b. Charge Two .......... 1121
c. Charge Three .......... 1124
2. The Sanctions .......... 1125
B. IRB Application XXV .......... 1125
C. This Court's Remand of Application XXV .......... 1125
D. The IRB's Supplemental Hearing and 1996 Opinion & Decision .......... 1126
E. IRB Application XXX .......... 1127

II. DISCUSSION .......... 1128
A. Giacumbo's Objections to Application XXV .......... 1128
1. The Recusal of Judge Lacey .......... 1128
2. The Sufficiency of the Evidence .......... 1131
a. Embezzlement .......... 1131
b. Bylaw Violations .......... 1135
i. Purchasing Computer Equipment For Local 843 .......... 1135
ii. Purchasing a Laptop Computer From Local 843 .......... 1137
iii. Charging Personal Expenses on Local 843's American Express Card .......... 1139
iv. Obtaining Only One Signature on Local 843 Checks .......... 1140
c. The Allways Organizing Attempt .......... 1142
3. The Appropriateness of the Sanctions .......... 1147
B. Giacumbo's Objections to Application XXX .......... 1150
1. Remand Procedure .......... 1150
2. Supplemental Hearing Testimony .......... 1152
a. Giacumbo's Claim that the IRB Ignored Testimony .......... 1152
b. Giacumbo's Claim that the IRB Mischaracterized Testimony .......... 1153
3. Union Democracy .......... 1155
4. Giacumbo's Violations of the IRB's Initial Sanctions .......... 1156
5. The Appropriateness of the Sanctions .......... 1157

III. CONCLUSION .......... 1160

This opinion emanates from the voluntary settlement of an action commenced by plaintiff United States of America against, *inter alia,* defendants International Brotherhood of Teamsters ("IBT") and the IBT's General Executive Board embodied in the voluntary consent order entered March 14, 1989 (the "Consent Decree"). Pursuant to the Rules and Procedures for Operation of the Independent Review Board for the International Brotherhood of Teamsters ("IRB Rules"), ¶ 0, the Independent Review Board ("IRB") has made an application to this Court seeking approval of its decision in this matter.

## *I. BACKGROUND*

Application XXX presents for this Court's review the decision of the IRB [1] regarding disciplinary charges brought against Gene Giacumbo ("Giacumbo"), a former President of IBT Local 843 ("Local 843" or "the Local") located in Springfield, New Jersey. From January 1, 1990, to December 31, 1992, Giacumbo was Local 843's President and principal officer. (Report of Charges from the Independent Review Board to Gene Giacumbo ("IRB Report") at 4 (Mar. 20, 1995).) In 1992, Giacumbo lost the Local 843 election. *Id.* During Giacumbo's tenure as president, Local 843 maintained a membership of approximately 500 Teamsters, the majority of whom were employees of the Anheuser Busch brewery in Newark, New Jersey. *Id.*

The events which gave rise to the instant charges against Giacumbo began with a December 22, 1993, letter (the "December 1993 letter") from Aaron Belk, the Teamsters Ethical Practices Committee Administrator, to the Chair of the Eastern Conference of Teamsters Ethical Practices Committee Panel (the "EPCP"). *Id.* The December 1993 letter contained a list of twelve allegations of wrongdoing by Giacumbo. *Id.* It did not, however, charge Giacumbo with violating any specific provision of either the IBT Constitution or the Local 843 Bylaws. *Id.* In response to the December 1993 letter, the EPCP held hearings concerning the charges against Giacumbo on March 14 and 15 and on April 4 and 5, 1994. *Id.* This hearing was not concluded, however, because the Giacumbo matter was transferred to the IRB with the consent of Giacumbo and the IBT. *Id.*

The IRB conducted an investigation into the allegations against Giacumbo, and subsequently levelled three charges against him. The charges against Giacumbo are contained in an investigative report issued by the IRB on March 20, 1995. (IRB Report at 31–34.) The IRB report charges Giacumbo as follows:

> [*Charge One:* ] While the principal officer of Local 843, you allowed employees of Allways Travel, including a friend of yours, to join Local 843 without negotiating any collective agreement of their behalf, but in an effort to assist their employer to obtain the IBT travel contract and to allow such members to be eligible to vote for you in the 1992 Local 843 election thereby bringing reproach upon the IBT in violation of Article II, Section 2(a) and Article XIX, Section 7(b)(1) and (2) of the IBT Constitution, *to wit:*
>
> By allowing a friend and others who work on commission at Allways Travel to join the union in order for their employer to gain an edge in receiving an IBT contract, you ignored the stated objects of the Local as set forth in Article II, Section 2.01(A)(2) and (3) of the Local's bylaws. In addition, you waived the initiation fee for the employees of Allways Travel without the approval of the Local's Executive Board as required by Article IX, Section 9.01(B) of the Local Bylaws. Moreover, you tried to obtain health insurance for the

1. The IRB is vested with broad investigatory and disciplinary powers. The IRB's investigatory authority is coextensive with that of the General President and the General Secretary–Treasurer under the IBT Constitution and applicable law. *See* February 2, 1994, Memorandum & Order, 842 F.Supp. 1550, 1551–52 (S.D.N.Y.1994); *see also* August 19, 1991, Opinion & Order, 803 F.Supp. 761, 768 (S.D.N.Y.1992), *aff'd in relevant part,* 998 F.2d 1101 (2d Cir.1993). Under the Consent Decree, the IRB must use this authority, among other things, to investigate allegations of corruption within the IBT, allegations of influence by La Cosa Nostra or other organized crime groups upon IBT members or activities, and any failure of IBT members or leadership to cooperate fully with the IRB. 842 F.Supp. at 1551–52; *see* Consent Decree § G(a).

Allways employees, not as a condition of employment with an employer, but by reducing yourself and the Local to an insurance broker who was searching for a policy from other Locals. By allowing the Allways employees, for whom the Local performed no collective bargaining representation, to join Local 843 only to pay dues at a time to ensure [that] they would be eligible to vote in the Local's election, you recruited individuals to join the union in order to be eligible to vote for you in the 1992 Local election.

[*Charge Two:* ] While the principal officer of Local 843 you engaged in a pattern of violating financial control provisions in the Local Bylaws, the IBT Secretary Treasurer's Manual and the IBT Constitution thereby breaching your fiduciary duties and bringing reproach upon the IBT and violating Article IV, Section 4.02(D), Article V, Section 5.01(A)(8) and (9) and Section 5.01(E) and Article IX, Section 9.01(B) of the Local Bylaws, Section 4 of the IBT Secretary Treasurer's Manual and Article II, Section 2(a) and Article XIX, Section 7(b)(1) and Article XXIII, Section 3 of the IBT Constitution, *to wit:*

In 1992, while the Local's principal officer, you waived the $150 initiation fee for the employees of Allways Travel. The Local 843 Executive Board did not approve this waiver as required by Article IX, Section 9.01(b) of the Local Bylaws.

Between approximately June 1991 and October 1992, you caused the Local to purchase a total of $15,752.34 in computer equipment without the approval of the Local's members as required by Article V, Section 5.01(A)(8) of the Local Bylaws. In or about December 1992, you purchased a laptop computer and a portable printer from the Local without the approval of the Local's members as required by Article V, Section 5.01(A)(9) of the Local Bylaws.

In 1992[,] you charged approximately $824.60 in personal expenses to the Local 843 American Express card and later reimbursed the Local for these charges. This conduct was prohibited by Section 4.1 of the IBT Secretary Treasurer's Manual which states "[U]nder no circumstances should personal expenses be charged and/or run through the Local union books." (alteration in IRB Report) (emphasis omitted).

Between January 1990 and January 1992, while a full-time salaried Local officer, you received in addition to your salary a total of approximately $1,440 for attending Executive Board meetings in violation of Article V, Section 5.01(E) of the Local Bylaws.

Between August and November 1990, you issued seven Local 843 checks by signing your signature and the signature of the Local 843 Vice President on these checks. On or about October 16, 1991 you issued a check to yourself with only your signature. On or about May 7, 1992, you transferred money from the Local's account with an investment company to the Local's general fund by issuing a check drawn on the investment account with only your signature. This conduct violated both Article XXIII, Section 3 of the IBT Constitution and Article IV, Section 4.02(D) of the Local 843 Bylaws which required two officer signatures on all Local Union checks.

[*Charge 3:* ] While an International Vice President and the President of Local 843, you failed to return to the IBT $1,600 in monthly car allowances you received between February 1992 and May 1992 when the Local was also paying your car expenses[,] thereby breaching your fiduciary duties and embezzling and converting $1,600 of IBT funds to your own use in violation of Article V, Section 1(e) and Article II, Section 2(a) and Article XIX, Section 7(b)(1), (2) and (3) of the IBT Constitution, *to wit:*

In the period from February 1992 through May 1992, you received a $400 monthly IBT car allowance while at the same time having Local 843 pay you car expenses. Pursuant to Article V, Section 1(e) of the IBT Constitution, "[a]llowances and expenses paid by the International Union shall be in lieu of any similar payment by a subordinate body or affiliate."

On or about June 1, 1992, you told the IBT to stop the monthly car allowance. However, you converted $1,600 in IBT

funds to your own use by not reimbursing the IBT for the monies you had already been given.

(IRB Report at 31–34.)

Because of the complexity of the instant matter's procedural history, this Court will review it at length. This Court will discuss: (1) Giacumbo's initial IRB hearing and the corresponding 1995 IRB Opinion and Decision imposing sanctions on Giacumbo; (2) Application XXV of the IRB ("Application XXV") seeking this Court's affirmance of the IRB's 1995 Opinion and Decision regarding Giacumbo; (3) this Court's remand of Application XXV to the IRB; (4) Giacumbo's supplemental IRB hearing and the corresponding 1996 IRB Opinion and Decision imposing enhanced sanctions on Giacumbo; and (5) Application XXX of the IRB ("Application XXX") seeking this Court's affirmance of the IRB's 1996 Opinion and Decision regarding Giacumbo.

### A. *The IRB's Hearing and 1995 Opinion & Decision*

On March 20, 1995, the IRB transmitted to Giacumbo a Notice of Hearing (the "Notice") and the IRB Report describing the three charges against him. (1995 IRB Opinion & Decision at 2.) The Notice informed Giacumbo that he was entitled to "present any evidence relevant to defense of the charges against [him]." (Transcript of Independent Review Board Meeting Re: Mr. Gene Giacumbo, *United States v. International Bhd. of Teamsters,* 88 Civ. 4486 ("Tr.") Exh. 9A (May 24 & 25, 1995).)

In a letter to the IRB dated May 16, 1995, Giacumbo requested that IRB member Judge Frederick B. Lacey ("Judge Lacey") recuse himself from participating in the IRB proceedings against Giacumbo. (Respondent Gene Giacumbo's Objections to the IRB's Opinion and Decision, *United States v. International Bhd. of Teamsters,* 88 Civ. 4486 (App. XXV Objections") at 6 (Dec. 4, 1995).) Giacumbo predicated his recusal request on statements allegedly made by Judge Lacey which Giacumbo argued reflected a political bias in favor of IBT General President Ron Carey ("Carey"), and against Carey's political opponents, including Giacumbo. *Id.* By letter dated May 17, 1995, Judge Lacey informed Giacumbo's attorney, J. Bruce Maffeo, Esq. ("Maffeo"), that he would not recuse himself, and that he had no objection to Giacumbo's bringing the recusal issue before this Court. *Id.* On May 19, 1995, Giacumbo filed an application for an Order to Show Cause before this Court seeking a hearing regarding Judge Lacey's alleged bias. *Id.* On May 22, 1996, this Court denied Giacumbo's application. *Id.*

Although Judge Lacey declined to recuse himself, IRB member Judge William Webster ("Judge Webster") voluntarily recused himself from all proceedings regarding Giacumbo due to Judge Webster's past association with Anheuser Busch, the Local 843 members' principal employer. (Letter from the Honorable William H. Webster to the Honorable David N. Edelstein, United States District Judge for the Southern District of New York (May 8, 1996).) As a result, the IRB panel before which Giacumbo appeared consisted solely of Judge Lacey and Grant Crandall, the third IRB member.

On May 24 and 26, 1995, the IRB held a hearing concerning the charges against Giacumbo in New York City (the "hearing"). (Chief Investigator's Memorandum of Law In Support of the Independent Review Board's Application XXV, *United States v. International Bhd. of Teamsters,* 88 Civ. 4486 ("CI Memo") at 2 (Dec. 14, 1995).) Giacumbo attended the hearing and was represented by counsel. (Tr. 2)

At the hearing, the Chief Investigator presented the IRB with exhibits, including the IRB Report, as well as testimony regarding the significance of each exhibit. (Tr. 21.) Giacumbo called several witnesses in his defense. *See id.* at 42–190. In addition, Giacumbo testified at the hearing in his own behalf. *Id.* at 190–223 & 232–379. This Court will review the evidence presented to the IRB concerning each of the charges against Giacumbo. This Court will then discuss the sanctions the IRB imposed on Giacumbo.

#### 1. *The Charges Against Giacumbo*

To reiterate, the IRB charged Giacumbo with: (1) improperly permitting employees of

Allways Travel Agency ("Allways") to join Local 843; (2) engaging in a pattern of improper financial conduct with Local 843's funds; and (3) embezzling funds from the IBT. (IRB Report at 31–34.) This Court will discuss the facts underlying, and the IRB's findings with respect to, each charge against Giacumbo.

*a. Charge One*

The first charge against Giacumbo alleges that he improperly permitted employees of Allways to join Local 843. Allowing the Allways employees to join the Local was alleged to be improper because their membership was for two purposes other than representing them in collective bargaining—the only legitimate reason for IBT membership. (1995 IRB Opinion & Decision at 2.) The actual reasons alleged for the Allways employees' membership were that: (1) Giacumbo expected the Allways employees to vote for him in the upcoming Local 843 nomination meeting and election; and (2) Giacumbo would assist Allways in its bid for the IBT travel contract. *Id.*

Allways is located in Sea Bright, New Jersey, Giacumbo's home town. *Id.* The IRB was presented with evidence that, from 1990 to 1992, Giacumbo maintained a "personal relationship" with Antoinette ("Toni") Russo ("Russo"), a travel agent at Allways. *Id.;* (Tr. 265–66.) Until that time, no business relationship existed between Local 843 and Allways or its employees. (1995 IRB Opinion & Decision at 2); (Tr. 337–38.) After the relationship between Giacumbo and Russo began, however, "about five full-time employees of Allways, including Russo, on or about April 29, 1992[,] signed dues checkoff cards for Local 843." (1995 IRB Opinion & Decision at 2.) Giacumbo was responsible for bringing these new members into the Local. *Id.*

The IRB received evidence that Giacumbo "negotiated" with the Allways employees to calculate a "favorable" dues rate of $10 per month each. *Id.* at 2–3. By comparison, the Local 843 members who work at the Anheuser Busch brewery each pay $36 per month. *Id.* at 3 n. 2. In addition, the Allways employees did not pay their union dues until September 1992, nearly four months after they became members of Local 843. *Id.* at 3. When the Allways employees' dues were paid, the "dues for all five members were paid in a lump sum by a personal check from Russo." *Id.* at 3 & Exh. 21. Russo again used her own personal checks to pay the October and November dues for all five Allways employees. *Id.* at 4.

Under Article VIII, Section 8.01(C)(1) of the Local 843 Bylaws, Russo's payments rendered the Allways employees eligible to vote at the November 1, 1992, meeting at which nomination for Local 843 officers occurred, as well as in the subsequent Local 843 election which was conducted by ballots mailed on November 12, 1992. *Id.* at 4 & 4 n. 5. Giacumbo ran as the incumbent Local President at both the November 1 meeting and the November 12 election. *Id.* at 4. He won the nomination, but lost the election by approximately 51 votes on December 2, 1992. *Id.;* (Tr. Exh. 27.) Within twenty days of Giacumbo's loss, each of the Allways members of Local 843 withdrew from the Local, and the Local did not make any demonstrable effort to retain the Allways members. (1995 IRB Opinion & Decision at 4–5.)

In addition, the IRB was presented with evidence that, at approximately the same time that the Allways employees signed authorization cards to become members of Local 843, the IBT's travel contract was "up for bid" and several travel agencies, in addition to Allways, submitted travel bids to the IBT. *Id.* at 5. In his testimony at the hearing, Giacumbo stated that he informed the Allways employees that he would endorse the Allways bid for the IBT's travel contract only if Allways became a "union shop." *Id.;* (Tr. 267.) Moreover, Local 843 Recording Secretary Deborah Kuffer ("Kuffer"), one of the witnesses Giacumbo called at the hearing, identified the travel contract as "the reason" the Allways employees became Teamsters. (1995 IRB Opinion & Decision at 5 & 5–6 n. 9.) Giacumbo admitted at the hearing that he personally delivered Allways' bid for the IBT travel contract. *Id.* at 6. On or about August 4, 1992, however, the IBT travel contract was awarded to another travel agency. *Id.* Nevertheless, even after Allways failed

to obtain the IBT travel contract, Giacumbo encouraged other union officials to use Allways for their IBT travel. *Id.* at 6; (IRB Report at Exh. 51, at 36–37.)

The IRB notes that "Giacumbo's testimony [at the hearing] regarding any collective bargaining purpose for the relationship between the Local, the five or six Allways employees, and Allways, is remarkably sparse." (1995 IRB Opinion & Decision at 6.) According to Giacumbo, the Allways employees, including Russo, expressed their concerns to him about the health benefits package that Allways provided them. *Id.;* (Tr. 266, 272.) Despite Giacumbo's alleged interest in this matter, Local 843 neither handled grievances nor conducted formal negotiations on behalf of Allways' employees. (1995 IRB Opinion & Decision at 6.) Instead, Giacumbo previously testified at a deposition conducted by Celia A. Zahyner, Esq., Special Counsel to the IRB's Chief Investigator's Office, that he spoke with officials at other Local Unions regarding whether the Allways employees could participate in any of the locals' health care plans. *Id.* at 7; (IRB Report at Exh. 1, at 152–53.) Giacumbo's testimony, however, is rendered suspect by the conflicting statements of Mario F. Perrucci ("Perrucci"), a former Vice president of IBT Local 171. (IRB Report at Exh. 51, at 38.) According to Perrucci, when Giacumbo met with Perrucci, Giacumbo mentioned obtaining health coverage for Russo only, not any of the other Allways employees. (IRB Report at Exh. 51, at 38.)

Based on the evidence presented at the hearing, the IRB determined that the Chief Investigator had established that Giacumbo committed the conduct with which he was accused in Charge One. First, the IRB found that, "[b]y allowing the Allways employees, for whom the Local performed essentially no collective bargaining representation, to join Local 843 only to pay dues at a time when they would be eligible to vote in the Local election, Giacumbo recruited individuals to join the union in order to be potentially eligible to vote for him in the Local Election." (1995 IRB Opinion & Decision at 7.)

Second, the IRB found that Giacumbo violated Article II, Section 2.01(A)(2) and (3) of the Local 843 Bylaws. These provisions in relevant part provide:

> The objects of this Local Union shall be: . . .
>
> (2) To engage in organizing workers to provide services to those who are organized;
>
> (3) To secure improved wages, hours, working conditions and other economic advantages through organization, negotiations and collective bargaining, through legal and economic means, and other lawful methods.

*Id.* at 7–8 (citing IRB Report at Exh. 19). The IRB thus found that, "[b]y permitting a friend and others who work on commission to join the union in order for their employer to gain an edge in receiving an IBT contract, Giacumbo ignored the stated objects of the Local." *Id.* at 7. Moreover, "[i]n reducing himself and the Local to an insurance broker who was searching for a policy from other locals, Giacumbo violated his obligations to the union." *Id.*

In reviewing the evidence presented to it, the IRB found that "Giacumbo's testimony[,] as well as the circumstances he acknowledged, support our finding that the membership of the Allways employees was not solicited for any purpose within [Article II, Section 2.01(A)(2) and (3) of the Local 843 Bylaws]." *Id.* at 8. The IRB states that while Giacumbo's recollection is clear concerning both the details of his setting the Allways' employees union dues and his efforts to promote Allways' business interests, Giacumbo's "recollection regarding any efforts on his or anyone else's part to obtain benefits for the employees through the collective bargaining process is unclear and lacking in any meaningful corroborative detail." *Id.* Instead, the IRB found that Giacumbo's "efforts to obtain medical insurance coverage appear to be more like that of an insurance broker searching for a policy from other sources rather than an effort actually to obtain such benefits through the collective bargaining process." *Id.* Moreover, the IRB "specifically discredit[ed] Giacumbo's testimony" regarding his efforts to ob-

tain health benefits for Allways employees through collective bargaining as a result of his demeanor as well as conflicts in his testimony. *Id.* at 8–9 & 9 n. 12.

The IRB also reasoned that "[g]iven the timing of the payment of the dues of the Allways employees, the personal relationship of Giacumbo and Russo, the circumstances that little or nothing was done to foster the proffered legitimate purpose for the transaction and the resignation from the union of the Allways employees when Giacumbo was not re-elected to the position of Local Union President, we find that the relationship between the Local and Allways employees was not formed to obtain benefits of collective bargaining for those employees." *Id.* at 9. In addition, the IRB found that "[t]he circumstances of the unlikelihood of a bona fide organizing effort for such a small number of employees in an area of commerce unfamiliar to the union ... also weighs heavily against the legitimacy of the relationship" between Local 843 and Allways. *Id.* In light of the foregoing evidence, the IRB concluded that "the purpose of the [Local 843–Allways relationship] was to promote the political career of Giacumbo," in violation of Article II, Section 2(a) and Article XIX, Section 7(b)(1) and (2) of the IBT Constitution. *Id.* at 10.

*b. Charge Two*

Charge Two accuses Giacumbo, as Local 843's principal officer, of engaging in a pattern of ignoring the financial control requirements of the IBT Constitution, the Local Bylaws, and the IBT Secretary–Treasurer's Manual. *Id.* at 11. The conduct underlying these violations includes: (1) waiving the $150 initiation fee for the Allways employees without the requisite approval of the Local's Executive Board; (2) releasing Local 843 checks to himself without two required signatures; (3) purchasing computer equipment for the Local and then buying part of the equipment back from the Local for his personal use; (4) charging personal items on the Local's American Express card and later reimbursing the Local; and (5) receiving payments in addition to his salary for attending Executive Board meetings. *Id.* at 12.

In support of the first instance of Giacumbo's financial misconduct, the Chief Investigator presented the IRB with Local 843 records showing that "[t]he Allways employees did not pay any initiation fee to Local 843." *Id.* at 11 n. 16; (IRB Report at Exhs. 17 & 23.) Article II, Section 2(a) and XIX, Section (7)(b)(1) and (2) of the IBT Constitution and Article IX, Section 9.01(B) of the Local 843 Bylaws provide that only the Local's Executive Board can approve the waiver of a member's initiation fee. (1995 IRB Opinion & Decision at 11 n. 16); (IRB Report at Exhs. 19 & 36.) The IRB was also presented with evidence that the Local 843 Executive Board minutes do not contain "any mention of Allways, let alone any Executive Board approval to waive the initiation fee for the Allways employees." (1995 IRB Opinion & Decision at 11 n. 16); (IRB Report at Exhs. 11–13.) As a result, the IRB determined that Giacumbo violated Article II, Section 2(a) and XIX, Section (7)(b)(1) and (2) of the IBT Constitution and Article IX, Section 9.01(B) of the Local 843 Bylaws.

To prove the second of Giacumbo's financial misdeeds, the Chief Investigator presented the IRB with evidence that Giacumbo improperly released Local 843 checks to himself, despite having received several written warnings that such conduct was prohibited. By letter dated December 21, 1990, Steven A. Jay ("Jay"), the accountant for Local 843 at the time, advised Giacumbo that during Jay's examination of the Local's books for November 1990, Jay determined that there was a "problem" with the manner in which several of Local 843's checks had been signed. *Id.* at 12; (IRB Report at Exh. 44.) In that letter, Jay advised Giacumbo that the Local Bylaws required two separate officer signatures on all Local checks. (App. XXV Objections at 12.) On seven Local checks—four of which were made out to Giacumbo himself—Giacumbo signed his own name as well as the name of 843 Local Vice–President Fred Chambers ("Chambers"). *Id.;* (IRB Report at Exh. 45.) Although admitting that he had committed a "technical violation" of the Local Bylaws, Giacumbo testified at his deposition that he had Chambers' authorization to sign Chambers' name on the checks, and that Giacumbo initialed Chambers' signa-

ture with his initials, "GG." *Id.;* (IRB Report at Exh. 1, at 75.)

By letter dated February 20, 1991, the IBT General Secretary–Treasurer at that time, Weldon L. Mathis ("Mathis") informed Giacumbo that:

> It has been brought to my attention that you have signed checks for various items without obtaining the necessary second signature from another officer of the Local Union.... While your attorney has assured this office that you are no longer issuing checks without proper signatures, I wish to bring it to your attention that this is a serious breach of the Bylaws of the Local Union and of the Manual for Secretary Treasurers. I trust that it will not be repeated.

*Id.;* (IRB Report at Exh. 78); *see also* (Tr. 303–04.) In July 1991, Giacumbo asked Mathis about the "appropriate procedures for using a rubber stamp signature" together with a handwritten signature on Local checks. (1995 IRB Opinion & Decision at 13–14.) In his August 8, 1991 response setting forth the steps necessary for using a facsimile signature on Local checks, Mathis again cautioned Giacumbo. *Id.* at 14. Mathis stated:

> It is the intent of Article XXIII, Section 3 of the [IBT] Constitution that a Local union follow proper internal accounting controls when processing Local [U]nion disbursements, and the use of improperly approved facsimile signatures (which would include rubber stamp facsimile signatures) indicates that the appropriate officers of the Local union are not adhering to their fiduciary responsibilities in that disbursements can be made without their knowledge.

*Id.*

Despite these three written warnings and the assurances of his attorney that this practice would cease, the Chief Investigator presented evidence that Giacumbo continued improperly to issue Local checks. For example, on September 12, 1991, a check was issued to Giacumbo with only his signature. *Id.;* (IRB Report at Exhs. 83.) Giacumbo asserts that this check was an advance for vacation pay for the week of October 7, 1991. (1995 IRB Opinion & Decision at 14); (Tr. 329.) On that same day, however, Giacumbo issued three Local 843 checks to other payees, all of which contained the requisite second signature. (1995 IRB Opinion & Decision at 15.) The IRB states that "Giacumbo could not explain why his advance vacation pay check was issued with only his signature" while the other checks were not, "[n]or could Giacumbo explain why he was paid on September 12, 1991[,] for vacation during the week of October 7, 1991." *Id.;* (Tr. 376–78.)

Furthermore, on October 16, 1991, Giacumbo again issued a Local 843 check to himself bearing only his signature. (1995 IRB Opinion & Decision at 15); (IRB Report at Exh. 50.) This check represented an advance on Giacumbo's salary for the weeks of October 28 and November 4, 1991. (1995 IRB Opinion & Decision at 15); (Tr. 326). That same day, Giacumbo issued three more Local checks to other payees, each of which contained the two required signatures. (1995 IRB Opinion & Decision at 15.) As with the September 12 checks, only the check payable to Giacumbo was signed solely by Giacumbo. *Id.* The IRB rejected Giacumbo's testimony explaining these checks on the grounds that his explanation for these transactions was not credible. *Id.* As a result, the IRB found that the "foregoing conduct violated both Article XXIII, Section 3 of the IBT Constitution and Article IV, Section 4.02(D) of the Local 843 Bylaws." *Id.*

In support of the third episode of Giacumbo's financial misfeasance, the IRB received evidence that Giacumbo "caused the Local to purchase computer equipment in the total amount of approximately $15,752.34 without membership approval." *Id.* at 16–17. Because the IRB determined that these expenditures were "both non-routine and 'of a substantial nature,'" Article V, Section 5.01(A)(8) of the Local 843 Bylaws required the computer purchase to be made only after obtaining "specific authorization at a membership meeting." *Id.* at 17 n. 26. The IRB found that, although the Local Executive Board discussed the "computeriz[ation] [of] the office," the minutes of the Executive Board meetings were never read at a mem-

bership meeting, and the members neither were on notice of the expenditure nor did they approve it. *Id.* at 17–18. As a result of this conduct, the IRB determined that Giacumbo violated Article V, Section 5.01(A)(8) of the Local 843 Bylaws and Article XIX, Section 7(b)(1) of the IBT Constitution. *Id.* at 18.

To prove the fourth instance of Giacumbo's financial misconduct, the Chief Investigator presented evidence to the IRB that, in December 1992, after losing the 843 Local election, Giacumbo purchased a laptop computer and a printer from the Local for $1,000. *Id.* at 19; (IRB Report at Exh. 43.) Giacumbo obtained two appraisals on the equipment, with one valuing it at $875, and the other at $920. (1995 IRB Opinion & Decision at 19.) The laptop alone originally cost approximately $2,500. *Id.* The Local's Executive Board approved Giacumbo's purchase on December 18, 1992. *Id.*

Pursuant to Article V, Section 5.01(A)(9) of the Local 843 Bylaws, however, the Executive Board has the authority to:

> sell or dispose of any real or personal estate, property, rights or privileges belonging to the organization whenever in its opinion the Local Union's interests would thereby be promoted, subject to approval (except as to form) at a membership meeting.

*Id.;* (IRB Report at Exh. 19, at 17.) No membership approval was reflected in the minutes of any Local 843 membership meeting. (1995 IRB Opinion & Decision at 19); (IRB Report at Exh. 18.) Moreover, the minutes of the Executive Board meeting at which Giacumbo's computer purchase was approved were not read to the membership. (195 IRB Opinion & Decision at 20.) Based on this conduct, the IRB found that Giacumbo violated Article V, Section 5.01(A)(9) of the Local 843 Bylaws and Article XIX, Section 7(b)(1) of the IBT Constitution by purchasing computer equipment from the Local without membership approval. *Id.*

To establish the fifth example of Giacumbo's financial misdeeds, the Chief Investigator presented to the IRB evidence demonstrating that Giacumbo improperly charged personal expenses on the Local's charge card. In 1992, Giacumbo charged a total of $824.60 in personal charges on Local 843's American Express card. *Id.* After the Independent Administrator found that two other officers of Local 843 had embezzled union funds by charging personal items on their Local 843 American Express cards, Giacumbo reimbursed the Local for his personal charges on the Local's American Express card. *Id.* at 20 n. 33.

Charging personal expenses to the Local's charge card violates Section 4.1 of the IBT Secretary Treasurer's Manual which provides: "[U]nder no circumstances should personal expenses be charged to and/or run through the Local Union books." *Id.* at 21; (IRB Report at Exh. 64.) The IRB thus found that, "[b]y charging personal items to the Local's American Express card, Giacumbo disregarded this provision of the IBT Secretary Treasurer's Manual." (1995 IRB Opinion & Decision at 21.)

To demonstrate the sixth instance of Giacumbo's financial misdeeds, the IRB was presented with evidence that Giacumbo improperly received payment for attending Local 843 Executive Board meetings. In 1984, prior to Giacumbo's term as Local 843 President, the Local 843 Executive Board voted to pay the President and Secretary–Treasurer $60 per meeting for attending Executive Board meetings. *Id.* at 22. From January 1990 to January 1992, when Giacumbo was a full-time paid officer of Local 843, he received $60 for every Executive Board meeting he attended, for a total of $1,440. *Id.*

Article V, Section 5.01(E) of the Local 843 Bylaws provides: "By action of the Local Union Executive Board, members of the Board who are not full-time paid officers or employees of the organization may be paid their expenses, including wages lost, if any, for attendance at each meeting of the Board." *Id.;* (IRB Report at Exh. 19, at 19.) The IRB determined that, despite the 1984 Executive Board vote to the contrary, Giacumbo's receipt of the $60 payments violated the Local Bylaws. (1995 IRB Opinion & Decision at 22.) The IRB also rejected Giacumbo's claim that his administration simply followed prior practice of the Local with re-

spect to paying the full-time officers to attend Executive Board meetings. *Id.* The IRB first explained that "[t]he defense of past practice is not available in the face of specific wording of the foregoing bylaws." *Id.* at 23. In addition, the IRB reasoned that because, unlike the previous administration, the Executive Board meetings under the Giacumbo administration were held during the day, the claim that the $60 fee constituted overtime compensation is unavailable. *Id.* at 22 n. 37. As a result, the IRB found that Giacumbo violated Article V, Section 5.01(E) of the Local Bylaws.

c. *Charge Three*

Charge Three accuses Giacumbo of embezzling $1,600 from Local 843. Giacumbo became an IBT Vice President in February 1992. *Id.* at 23. The IRB was presented with evidence that between February 1992 and May 1992, Giacumbo received a monthly car allowance of $400 from the IBT. *Id.;* (IRB Report at Exh. 31.) During that same period, Local 843 also paid Giacumbo a total sum of approximately $797.62 for his gas, insurance, and repairs. (1995 IRB Opinion & Decision at 23); (IRB Report Exhs. 31 & 34.) Giacumbo thus received overlapping car allowances—one each from the IBT and the Local.

Based upon the evidence presented to it, the IRB found that Giacumbo "knowingly and intentionally accepted an aggregate of $1,600 in payments to which he knew he was not entitled." (1995 IRB Opinion & Decision at 23.) The IRB explained that "[e]ven though the monthly car allowance was listed on Giacumbo's pay check stub from the [IBT], and even though the $400 monthly car allowance for [IBT] officers was specifically set forth in Article V, Section 1(e) of the IBT Constitution, Giacumbo testified that he did not know that he had received an IBT car allowance until his sworn examination on September 7, 1994." *Id.* at 24. In addition, the IRB pointed out the inconsistency of Giacumbo's claimed ignorance of the car payments until September 1994 because, "according to IBT records[,] on or about June 1, 1992[,] Giacumbo telephoned the IBT to request that his IBT car allowance be discontinued." *Id.* The IRB found a further inconsistency in Giacumbo's testimony that, when he first became an IBT officer, he believed that he "signed somewhere right from the beginning not to give me the car allowance because [he] took it from the local union." *Id.;* (IRB Report at Exh. 1, at 177–80.) Although the IBT records do not reflect that Giacumbo made such a request, the IRB found that by stating that he requested that the IBT not pay him a car allowance, Giacumbo recognized "from the outset that overlapping payments should not have occurred." (1995 IRB Opinion & Decision at 24–25.) The IRB also expressed its skepticism of Giacumbo's ignorance because he accepted the car allowance from the IBT during the time he purportedly requested the allowance to be discontinued. *Id.* at 25. Finally, the IRB noted that, even after acknowledging that he was wrongly over-paid for his car expenses, Giacumbo "still did not reimburse either the IBT or the Local ... even though he testified [that] he would." *Id.;* (IRB Report at Exh. 1, at 177, 190.)

In light of this evidence, the IRB found that Giacumbo knowingly and intentionally accepted $1,600 in car payments to which he knew he was not entitled. (1995 IRB Opinion & Decision at 25.) The IRB "discredit[ed] Giacumbo's testimony denying [his] knowing acceptance of the monies." *Id.* The IRB did not accept his claim that he was "ignorant of his own actions," and discounted his testimony based upon both the IRB's observation of Giacumbo's demeanor during the hearing and the inconsistencies discussed above. *Id.* The IRB summed up its conclusions regarding Giacumbo's testimony as follows:

> On the one hand, Giacumbo claims that he requested that the [IBT's] car allowance be discontinued in his February and July 1992 communication to the [IBT]; meanwhile, each paycheck states that it includes a $400 allowance. Then, in his sworn examination, he testified that he was not aware that he had received a car allowance, even though two times he disclaimed, or requested discontinuances of, the benefit. Even his promise, during his sworn testimony, to repay the amounts was never carried out.

*Id.* at 25–26. Accordingly, the IRB found that, "[b]y receiving a car allowance from the IBT while at the same time having a Local 843 reimburse him for his car expenses, Giacumbo breached his fiduciary duties and embezzled $1,600 in violation of Article XIX, Section 7(b)(1), (2) and (3) of the IBT Constitution." *Id.* at 28.

*2. The Sanctions*

The IRB found that all three of the charges against Giacumbo had been proven. *Id.* at 28. Moreover, the IRB "specifically reject[ed] the efforts of Giacumbo to pass off the violations as trifling, harmless, or *de minimis,*" and determined that those efforts "actually underscore his arrogance of power." *Id.* The IRB also explained that, although Giacumbo's misconduct "is not as great as perhaps in some other cases, the fact remains that serious violations of fundamental concepts within the IBT Constitution and Bylaws have occurred." *Id.*

As a result of Giacumbo's "serious violations," the IRB imposed on him the following sanctions:

(1) Giacumbo be suspended from membership and from his position in the IBT for a period of *six months;*

(2) That during his suspension Giacumbo draw no salary or compensation from any IBT-affiliated source;

(3) That Giacumbo be fined, with the fines to be paid to the IBT in the amount of $1,600;

(4) These fines cannot be waived by either Local nor can they be set off against Giacumbo's future salary;

(5) Giacumbo must show proof that the payments have been made to the IBT and such payment must be made before Giacumbo can resume employment.

*Id.* at 29 (emphasis added).

*B. IRB Application XXV*

On November 15, 1995, the IRB submitted to this Court Application XXV of the Independent Review Board—Opinion and Decision of the Independent Review Board in the Matter of the Hearing on Charges Against Gen Giacumbo, *United States v. International Bhd. of Teamsters,* 88 Civ. 4486 ("Application XXV") (Nov. 15, 1995). Pursuant to Paragraph O. of the IRB Rules, the IRB "respectfully requested that an Order be entered affirming the [1995 IRB Opinion and Decision]" imposing sanctions upon Giacumbo. *Id.* at 1–2. On November 22, 1995, Chambers notified Maffeo, Giacumbo's attorney, that if he or Giacumbo wished to file objections to application XXV, such objections must be in writing and mailed to this Court no later than fourteen days from the date of the letter. (Letter from James C. Maroulis, Law Clerk to the Honorable David N. Edelstein, United States District Judge for the Southern District of New York, to J. Bruce Maffeo, Esq. (Nov. 22, 1995).)

On December 4, 1996, this Court received the 1995 IRB Giacumbo's objections to IRB Application XXV. In these objections, Giacumbo argues that the IRB's findings and sanctions regarding him were "arbitrary and capricious" because: (1) IRB member Judge Lacey should have recused himself from the proceedings, (App. XXV Objections at 4–10); (2) the evidence against Giacumbo was insufficient to sustain any of the charges, *id.* at 11–23; and (3) the sanctions imposed are excessive in light of the charges, *id.* at 24–27. On December 14, 1995, the Government submitted a letter opposing Giacumbo's objections and supporting the IRB's 1995 Opinion and Decision. (Letter from Beth E. Goldman, Assistant United States Attorney, to the Honorable David N. Edelstein, United States District Judge for the Southern District of New York ("Gov't App. XXV Letter") (Dec. 14, 1995).) Also on December 14, 1995, this Court received a memorandum from the Chief Investigator Supporting Application XXV. (Chief Investigator's Memorandum of Law in Support of the Independent Review Board's Application XXV ("CI Memo") (Dec. 14, 1995).)

*C. This Court's Remand of Application XXV*

On January 11, 1996, this Court remanded IRB Application XXV to the IRB "for further consideration." (Order, *United States v. International Bhd. of Teamsters,* 88 Civ. 4486 (the "Remand Order") at 2 (Jan. 11,

1996).) After reviewing the 1995 IRB Opinion and Decision, its accompanying exhibits and Giacumbo's Objections, this Court found that "regardless of the merits of the IRB's charges, the sanctions imposed by the IRB are not commensurate with the severity of the charges levelled against Giacumbo." *Id.* at 2. This Court thus found that "the IRB should reconsider its sanctions in light of the fact that the IRB has found that Giacumbo has brought reproach upon the IBT by facilitating union membership for improper purposes, breaching his fiduciary duties, violating Local 843 financial control provisions, and embezzling IBT funds." *Id.* The Remand Order did not consider the merits of either IRB Application XXV or Giacumbo's objections to Application XXV. *Id.*

### D. *The IRB's Supplemental Hearing and 1996 Opinion & Decision*

After this Court remanded Application XXV to the IRB for reconsideration of the sanctions imposed on Giacumbo in light of the gravity of the charges against him, the IRB granted Giacumbo's counsel's request for an opportunity to present additional testimony concerning Giacumbo's character. (Opinion and Decision of the Independent Review Board on Remand, *United States v. International Bhd. of Teamsters,* 88 Civ. 4486 ("1996 IRB Opinion & Decision") at 1–2 (May 1, 1996).) In order to receive this evidence, the IRB held a supplemental hearing on March 21, 1996 (the "supplemental hearing"). At the supplemental hearing, Giacumbo presented the IRB with the testimony of: (1) Daniel J. Kane ("Kane"), President of IBT Local 111; (2) Sam Theodus ("Theodus"), President of IBT Local 407 and IBT President–at–Large; (3) Robert Krohmert ("Krohmert"), a member of Local 843; and (4) Wayne Ferguson ("Ferguson"), a "long-time social friend of Giacumbo's." *Id.* at 2.

In its 1996 Opinion and Decision, the IRB states that "Kane gave generally conclusory testimony that Giacumbo was 'honest' in addition to being courageous and smart." *Id.* at 2. Kane also expressed his admiration for Giacumbo's political views on IBT issues and for standing up for his beliefs within the IBT. *Id.* The IRB found that Theodus "opined, based solely upon his perception of Giacumbo's belief in the IBT and Giacumbo's role as a political crusader, that he was honest." *Id.* Krohmert, in testifying at the supplemental hearing, "primarily based his opinion of Giacumbo's honesty upon the results Giacumbo obtained in effectuating Krohmert's return to work after a sickness." *Id.* Finally Ferguson testified that he "never had reason to question Giacumbo's honesty." *Id.*

The IRB found that these witnesses' "conclusory testimony concerning Giacumbo's character does not cause us to conclude that any sanctions to be imposed should be lessened 'commensurate with the severity of the charges proven,'" as directed by this Court's Remand Order. *Id.* at 3. In reaching this finding, the IRB observed that "[n]one of these witnesses had any knowledge of Giacumbo's specific practice and dealings on the Local level, particularly as they related to the IRB's findings for its [1995] Opinion and Decision." *Id.* at 2–3. The IRB also noted that "Giacumbo himself offered no explanation at the supplemental hearing for his conduct recounted in [the 1995 IRB Opinion and Decision][,] nor did he report that the $1,600 he has repeatedly promised to pay the IBT had in fact been paid." *Id.* at 3.

Furthermore, not only did Giacumbo's character witnesses not help him, the IRB found that "the character evidence itself supported the findings of [the 1995 IRB] Opinion and Decision reflecting Giacumbo's arrogance in the exercise of his power as a Union official." *Id.* The IRB states that Theodus "confirmed that he believed that Giacumbo sees himself as above the rules," and that "Giacumbo believed that there were situations when it was appropriate for local officers to violate the bylaws of their own locals." *Id.*

In addition, the IRB found that, prior to the supplemental hearing and while suspended from IBT membership, Giacumbo violated the terms of his six-month suspension. *Id.* at 5. On February 4, 1996, Giacumbo attended the Local 843 nomination meeting for delegates to the 1996 IBT Convention. *Id.* At that meeting, Krohmert nominated Giacumbo to serve as a delegate. *Id.* However, in order to be eligible to be a delegate, mem-

bers must be in "good standing." *Id.* After the Deputy Trustee of Local 843 filed a pre-election protest with the Election Officer, Giacumbo was ruled ineligible for nomination as a delegate because of the suspension imposed upon him by the 1995 IRB Opinion and Decision. *Id.* As a result of his nomination and the subsequent protest, the IRB found that "[t]here [was] no question that Giacumbo knew of, and acquiesced in, his name being placed in nomination and that he assisted in efforts to maintain his status as a delegate nominee, despite the fact that, due to his suspension from membership, he was clearly ineligible." *Id.* at 4–5. The IRB thus concluded that "Giacumbo willfully disregarded our initial sanction of a six-month suspension," which is "highly probative of Giacumbo's character, which he put in issue." *Id.* at 5. Looking to Giacumbo's character witnesses, the IRB stated that, whether Giacumbo is a "political crusader who has the courage to stand up for" what he believes are in the IBT's best interests, "does not place him or any other IBT member above the rules." *Id.* at 5–6.

The IRB then "reemphasize[d] the extent to which refusals to comply with rules and the abuse of trust and power appeared in the original record and conclude[d] that a suspension of three years from both membership and eligibility for office was required, particularly in light of the evidence added on this remand concerning Giacumbo's attitude toward Local rules and his disregard of his suspension." *Id.* at 6–7. The IRB thus imposed the following sanctions:

1. Giacumbo is suspended from membership and from holding any position in the IBT or related entity for a period of *three years* from October 31, 1995;

2. During this suspension, Giacumbo is to draw no salary or compensation from any IBT affiliated source;

3. Giacumbo is fined, with funds to be paid to the IBT, in the amount of $1,600;

4. These fines cannot be waived by any IBT entity nor can they be set off against Giacumbo's future earnings; and

5. Giacumbo must show proof that the payments have been made to the IBT and such payments must be made before Giacumbo can resume membership or any position in any IBT related entity.

*Id.* at 7–8 (emphasis added).

*E. IRB Application XXX*

On May 3, 1996, the IRB submitted for this Court's review Application XXX, "respectfully request[ing] that an Order be entered affirming the IRB's ... 1996 Opinion [and Decision]." (Application XXX of the Independent Review Board—Opinion and Decision of the Independent Review Board On Remand In The Matter Of The Charges Against Gene Giacumbo, *United States v. International Bhd. of Teamsters,* 88 Civ. 4486 ("Application XXX") at 2 (May 3, 1996).) By letter dated May 6, 1996, Chambers notified Maffeo, Giacumbo's attorney, that if he or his client wished to object to the IRB's findings and rulings, such objections to Application XXX must be submitted to this Court not later than ten days from the date of the letter. (Letter from Jennifer A. Meyer, Law Clerk to the Honorable David N. Edelstein, United States District Judge for the Southern District of New York, to J. Bruce Maffeo, Esq., (May 6, 1996).)

On May 16, 1996, this Court received a letter setting forth Giacumbo's objections to Application XXX. (Letter from J. Bruce Maffeo, Esq., to the Honorable David N. Edelstein, United States District Judge for the Southern District of New York ("App. XXX Objections") (May 15, 1996).) In this letter, Giacumbo challenges the IRB's findings and rulings in the 1996 IRB Opinion and Decision on four grounds. First, Giacumbo questions "the adequacy of the finding underlying this Court's decision to remand" Application XXV for reconsideration. *Id.* at 2. Second, Giacumbo asserts that, because the IRB ignored and mischaracterized portions of the testimony adduced at the supplemental hearing, the IRB's decision was arbitrary and capricious. *Id.* at 2–4 & 3 n. 1. Third, Giacumbo claims that his "presence at the Local 843 delegate election in no way contravened the terms of any of the sanctions imposed by the IRB." *Id.* at 4. Fourth, Giacumbo asserts that the IRB's sanctions are excessively harsh in light of past cases and "contributes to the perception that the

IRB's actions in this case are retaliatory" because they silence "one of the leading voices of opposition to the Carey administration." *Id.*

On May 28, 1996, this Court received from the Office of the Chief Investigator of the IRB a letter in support of IRB Application XXX. (Letter from Charles M. Carberry, Chief Investigator of the Independent Review Board, to the Honorable David N. Edelstein, United States District Judge for the Southern District of New York ("Carberry Letter") (May 28, 1996).) In that letter, Carberry argues: (1) that this Court's remand of Application XXV complied with governing law; and (2) that, based on the evidence presented to it, the IRB's decision was not arbitrary and capricious. *Id.* at 1–3.

Also on May 28, 1996, this Court received a letter from the Government. (Letter from Beth E. Goldman, Assistant United States Attorney, to the Honorable David N. Edelstein, United States District Judge for the Southern District of New York, ("Gov't App. XXX Letter") (May 28, 1996).) First, the Government maintains that Giacumbo's challenge to this Court's authority to remand Application XXV is untimely because he failed to raise it before the IRB at his supplemental hearing. *Id.* at 1–2. Second, the Government contends that, irrespective of the timeliness of Giacumbo's objection, this Court acted lawfully when it remanded Application XXV without considering its merits. *Id.* at 2. Third, the Government asserts that the IRB's findings and sanctions are amply supported by the record. *Id.* at 2–3.

## II. DISCUSSION

This Court has not yet considered the merits of Applications XXV or XXX, or of the submissions objecting to and in support of those applications. This Court will do so now.

As a preliminary matter, however, this Court notes that the law of the Consent Decree is well-settled that this Court's review of the factual findings of the IRB is narrowly circumscribed. Findings of the IRB are entitled to "great deference." *See, e.g., United States v. International Bhd. of Teamsters [Friedman & Hughes],* 905 F.2d 610, 616 (2d Cir.1990), *aff'd* March 13, 1990, Opinion & Order, 743 F.Supp. 155 (S.D.N.Y. 1990); *United States v. International Bhd. of Teamsters [Raimondi & Bertino],* 829 F.Supp. 608, 616–17 (S.D.N.Y.1993) (citing cases); IRB Rules ¶ O. This Court will overturn IRB findings only when this Court determines that they are, on the basis of all the evidence, "arbitrary or capricious." *See, e.g., United States v. International Bhd. of Teamsters [Sansone],* 981 F.2d 1362, 1368 (2d Cir. 1992); *United States v. International Bhd. of Teamsters [Wilson, Weber & Dickens],* 978 F.2d 68, 71 (2d Cir.1992); *United States v. International Bhd. of Teamsters [Cimino],* 964 F.2d 1308, 1311–12 (2d Cir.1992); *United States v. International Bhd. of Teamsters [Senese & Talerico],* 745 F.Supp. 908, 911 (S.D.N.Y.1990), *aff'd* 941 F.2d 1292 (2d Cir. 1991); *Raimondi & Bertino,* 829 F.Supp. at 616; IRB Rules ¶ O. With these constraints in mind, this Court will first consider Giacumbo's objections to Application XXV, and then it will consider his objections to Application XXX.

### A. Giacumbo's Objections to Application XXV

Giacumbo objects to IRB Application XXV on three grounds: (1) IRB member Judge Lacey should have recused himself from the proceedings, (App. XXV Objections at 4–10); (2) the IRB's findings and sanctions regarding Giacumbo were "arbitrary and capricious" because the evidence against Giacumbo was insufficient to sustain any of the charges, *id.* at 11–23; and (3) the sanctions imposed on Giacumbo are excessive in light of the charges, *id.* at 24–27. Both the Government and the IRB counter each of Giacumbo's objections. This Court will consider each of Giacumbo's objections individually.

#### 1. The Recusal of Judge Lacey

Giacumbo argues that Judge Lacey's failure to recuse himself from the IRB's consideration of the charges against Giacumbo "posed a direct threat to Mr. Giacumbo's right to a fair and impartial hearing, [and] implicate[d] the broader concern ... that the union's rank-and-file retain confidence in the

impartiality of the IRB." *Id.* at 9–10. Giacumbo asserts that Judge Lacey's alleged protection of IBT General President Carey in the past prevents Judge Lacey from impartially considering the charges against Giacumbo, a known Carey opponent.

Giacumbo asserts that, after he was elected IBT Vice President in 1991, "he learned information that led him to believe that Carey and members of his staff and family had met with associates of organized crime." *Id.* at 4. Giacumbo claims that he "also discovered evidence that during the 1980's [sic] and continuing to after his election as IBT General President, Mr. Carey had acquired substantial real estate holdings in Florida far in excess of his means." *Id.* Giacumbo contends that he "brought this information to the attention of various individuals, including Judge Lacey." *Id.*

During 1994, the IRB investigated Carey based, in part, upon the information Giacumbo supplied to the IRB. *Id.* Giacumbo's allegations against Carey were widely reported in the press. *Id.* at 4–5. The IRB's investigation also addressed allegations raised by Michael Maroney ("Maroney") that Carey had ties to organized crime. *Id.* at 4. Maroney was the deputy trustee to Thomas P. Puccio, Esq. ("Puccio"), the Court-appointed trustee for IBT Local 295. *Id.* In July 1994, the IRB, including Judge Lacey, issued a report clearing Carey of all the charges against him. *Id.* at 5; (Independent Review Board Report of Investigation of General President Ronald Carey, *United States v. International Bhd. of Teamsters,* 88 Civ. 4486 (the "Carey Report") (July 11, 1994).) The Carey Report stated that Giacumbo was one of the sources of the allegations against Carey and called Giacumbo a "political opponent of Carey." (App. XXV Objections at 5.)

On May 15, 1995, *Time* magazine published an article that quoted extensively from a letter purportedly written by Judge Lacey to Puccio in April 1994, three months before the IRB issued the Carey Report. *Id.* at 5–6. According to the article, Judge Lacey cautioned Puccio and Maroney against publicly revealing information regarding Carey's alleged links to organized crime. *Id.* at 6. In the passage of the letter quoted by *Time,* Judge Lacey suggested that release of such information could damage Carey's re-election chances and thus "turn ... the clock back to what it was when I first came on the scene as Independent Administrator." *Id.* Giacumbo argues that, because of Giacumbo's known political opposition to Carey and Judge Lacey's reported bias in favor of Carey, Giacumbo cannot obtain an impartial decision from an IRB panel which includes Judge Lacey. *Id.*

The Chief Investigator's submissions in support of Application XXV counter Giacumbo's claim that Judge Lacey should have recused himself from Giacumbo's IRB hearing. (CI Memo at 3.) The Chief Investigator argues that "Giacumbo alleged no specific facts which would have required [Judge] Lacey to recuse himself," but offers only "groundless speculation that [Judge] Lacey was somehow partial to General President Carey." *Id.* at 30. The Chief Investigator asserts that Giacumbo "failed to meet the applicable standard for recusal of an IRB member found in Article XIX, Section 1(a) of the IBT Constitution," which provides that "[i]n no event shall any *involved* officer or member serve on a hearing panel." *Id.* at 28–29 (emphasis in original).

The Government's letter in support of Application XXV points out that Giacumbo's argument for Judge Lacey's recusal is based upon the legal standard applicable to United States judicial officers—the "appearance of impartiality"—which does not apply to IRB members. (Gov't App. XXV Letter at 2 (citing 28 U.S.C. § 455).) The Government argues that the controlling legal standard for a recusal motion directed at an IRB member is that a member of an IRB hearing panel cannot be involved in the matter under review. *Id.* Pursuant to that standard, "Giacumbo's speculation does not sustain the burden of demonstrating that Judge Lacey should have recused himself." *Id.* Therefore, because "Giacumbo has not alleged nor offered any evidence whatsoever that Judge Lacey was involved in the actions that form the bases of any of the charges against [Giacumbo] ... Giacumbo's claim that [Judge] Lacey should have been recused should be denied." *Id.* The Government further ar-

gues that Giacumbo's mere speculation regarding Judge Lacey's bias would not suffice even under the legal standard for recusal in labor arbitration cases—"evident impartiality"—which is embodied in Title Nine, United States Code, Section 10(b). *Id.* at 3. Finally, the Government contends that Judge Lacey's recusal was unwarranted because his reported statements were not directed at Giacumbo. *Id.*

This Court begins by noting that this is not the first time that a teamster has sought the recusal of an IRB member based upon alleged bias. In *United States v. International Bhd. of Teamsters [Simpson],* 931 F.Supp. 1074 (S.D.N.Y.1996), this Court resolved a recusal motion directed at Judge Lacey from former IBT member and Local 743 President Robert T. Simpson, Jr. *Id.* at 1079. The *Simpson* opinion, however, was issued after the parties in the instant case argued their positions regarding Judge Lacey's recusal, and, as a result, the controlling legal standard was not available for the parties' use in their respective papers.

In *Simpson,* this Court considered and rejected several proposed standards for evaluating a motion to recuse a member of the IRB. *Id.* at 1103. The first proposed standard, which this Court rejected, was the standard applicable to United States judicial officers: "Any justice, judge or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." *Id.* (citing 28 U.S.C. § 455(a)). The second standard, which this Court also rejected, is that applicable to arbitrators under the United States Arbitration Act: Upon application of any party, a court may vacate an arbitration award "[w]here there was evident partiality or corruption in the arbitrators. . . ."). *Id.* at 1102–03 (citing 9 U.S.C. § 10(b)).

Instead, in *Simpson,* this Court determined that the appropriate standard for recusing members of the IRB is that set forth in Article XIX, Section 1(a) of the IBT Constitution. *Id.* at 1103. That provision states in relevant part:

> In no event shall any *involved* officer or members serve on a hearing panel, participate in the selection of a substitute member of a hearing panel, or participate in the decision making process of the trial body. This prohibition shall apply to any proceeding conducted under Article XIX, or any other Article of this Constitution.

*Id.* (emphasis added) (citation omitted). This Court reasoned that this provision should control a court's resolution of a motion to recuse an IRB member for two reasons: (1) it comes directly from the IBT Constitution which provides the authority both for instituting disciplinary proceedings against Teamsters and for establishing the IRB, and sets forth the rights and procedures to which all Teamsters subject to disciplinary action are due; and (2) it ensures that a uniform standard applies to disciplinary actions instituted by the IRB as well as by the IBT General President, General Secretary–Treasurer, and General Executive Board. *Id.* at 1104.

Applying this recusal standard to the instant case, this Court must determine whether Judge Lacey was "involved" in the events that constitute the bases of the charges against Giacumbo. This Court finds that Judge Lacey was not involved in these events. As both the Chief Investigator and the Government correctly points out, Giacumbo has produced no evidence that Judge Lacey had any involvement in the events which form the bases of the charges against Giacumbo. (CI Memo at 28–30); (Gov't App. XXV Letter at 2–3.) Instead, a review of Giacumbo's submissions reveals that the only reason Giacumbo asserts for Judge Lacey's recusal is Judge Lacey's alleged favoritism of Carey. Even assuming that Judge Lacey does favor Carey—and Giacumbo has presented no persuasive evidence upon which this Court could base such a finding—such favoritism would not even remotely establish Judge Lacey's involvement in the events underlying the charges against Giacumbo. Absent a showing of such involvement, Giacumbo cannot meet the standard necessary for this Court to find that Judge Lacey should have recused himself from the proceedings against Giacumbo. Accordingly, this Court finds that Judge Lacey was not an "involved officer" subject to recusal under Article XIX, Section 1(a) of the IBT Constitution.

2. *The Sufficiency of the Evidence*

Giacumbo's second challenge to IRB Application XXV is that the evidence presented to the IRB provided insufficient support for the IRB's findings and sanctions. (App. XXV Objections at 11–23.) Giacumbo challenges the adequacy of the evidence supporting the IRB's findings concerning: (1) his embezzlement; (2) his bylaw violations; and (3) his Allways organizing attempt. This Court will consider each of these objections in order.

a. *Embezzlement*

Giacumbo was charged in Count Three with embezzling $1,600 from the IBT by accepting car allowances from both the IBT and Local 843 from February through May of 1992. Giacumbo asserts that a finding of "fraudulent intent" is necessary to sustain a charge of embezzlement. *Id.* at 11. Giacumbo then argues that, in the instant case: (1) the IRB never made a finding on the record that he possessed fraudulent intent; and (2) the evidence adduced at the hearing "militate[s] powerfully against any finding of fraudulent intent." *Id.* at 11, 13.

In support of his first challenge to the IRB's finding that he embezzled funds from the IBT, Giacumbo points out that this Court's decision in *United States v. International Bhd. of Teamsters [Ligurotis]*, 814 F.Supp. 1165, 1178 (S.D.N.Y.1993), requires a finding of fraudulent intent to sustain a charge of embezzlement. (App. XXV Objections at 11.) Giacumbo then asserts that "[n]o such finding exists on this record." *Id.*

Giacumbo's second challenge to the IRB's embezzlement finding is that the evidence presented to the IRB militates against a finding of fraudulent intent. He asserts that the IRB ignored evidence that the car allowances from the IBT and from the Local were for different purposes. Giacumbo contends that because he was permitted to receive payments for two different types of car expenses, he could have had no fraudulent intent by accepting them. *Id.* Giacumbo asserts that Article V, Section 1(e) of the IBT Constitution "[i]mplicitly recognizes that there are different categories of expenses" because it provides: "All allowances and expenses paid to the [IBT] shall be in lieu of any *similar* payment of a subordinate body or affiliate." *Id.* (emphasis in original). Giacumbo then contends that "the monthly stipend [he] received from the IBT following his election to national office was a flat fee that contained no restrictions regarding the type of automotive expenses that could be defrayed." *Id.* In contrast, Giacumbo argues, "the reimbursement that [he] received from Local 843 was for out of pocket car expenses such as gas, oil, and insurance for which he submitted receipts." *Id.* Giacumbo contends that he had car expenses which were not paid for by the Local, and that he "was well within his right to use the IBT monthly stipend to pay for them." *Id.* at 12. Furthermore, Giacumbo asserts that, if he was not entitled to both payments, he was unaware of that prohibition because the IBT Manual on "Travel and Business Expense Policies for Members of the General Executive Board," which "seeks to clarify this area, was not published until May 1992, the last of the four months during which Mr. Giacumbo received his car allowance from the [IBT]." *Id.* at 11–12.

Giacumbo also claims that the IRB ignored two other pieces of evidence which militate against a finding of fraudulent intent. Giacumbo states that, following his election to national office in 1992, he "voluntarily relinquished his $52,000 annual salary from Local 843, despite the fact that he remained actively involved in managing the Local's affairs and thus was entitled to draw both salaries." *Id.* Giacumbo also points out that, as President of Local 843, he refused to approve a pay increase or to use a new car purchased by the union. *Id.* at 12–13. As a result of this evidence, Giacumbo argues that not only is there nothing on the record to support a finding that Giacumbo had fraudulent intent in accepting the car allowances, but also that the evidence suggests that Giacumbo properly accepted both car allowances. *Id.* at 13.

The Chief Investigator counters that the record contains sufficient evidence to support the IRB's finding that Giacumbo embezzled $1,600 from the IBT by wrongly accepting the car allowances. (CI Memo at 39.) The Chief Investigator asserts that Giacumbo's

fraudulent intent was demonstrated by his knowing receipt of the similar payments from both Local 843 and the IBT in violation of Article V, Section 1(e) of the IBT Constitution, as well as his attempt to conceal his conduct by "denying knowing that he received the IBT car allowance despite the fact that such payment was specifically reflected on his paycheck stubs." *Id.* The Chief Investigator also points out that the IRB explicitly rejected Giacumbo's claim of innocence, stating that "we do not accept that he was ignorant of his own actions." *Id.* (citing 1995 IRB Opinion & Decision at 25).

The Chief Investigator also directs this Court's attention to several other instances in which the IRB implicitly found that he possessed fraudulent intent based upon Giacumbo's own testimony. *Id.* at 39–40. For instance, Giacumbo testified that in February 1992 he requested that the IBT not pay him a car allowance. *Id.* The IRB found that this testimony implicitly acknowledges that Giacumbo knew from the start that his simultaneous receipt of car allowances from both the IBT and from the Local was improper. *Id.* In addition, the IRB found that Giacumbo's numerous unfulfilled promises to repay the IBT the $1,600 in car allowances reinforces the inference that Giacumbo knowingly accepted these payments. *Id.* at 40. The IRB further found that "Giacumbo's persistent failure to abide by the Bylaws and IBT Constitution with respect to financial controls was evidence of his intent to embezzle IBT funds. *Id.* Finally, the IRB found that Giacumbo's inconsistent testimony concerning the car allowance supports the finding that he possessed the fraudulent intent to embezzle IBT funds. *Id.*

Furthermore, the Chief Investigator points out that the IRB "properly rejected Giacumbo's claim that the IBT car allowance and the Local's payment of his car expenses did not constitute 'similar payments' within the meaning of Article V, Section 1(e) of the IBT Constitution." *Id.* at 41. At his hearing, Giacumbo did not testify that he received two different payments for two different purposes. *Id.* Instead, the IRB noted that during his sworn examination Giacumbo acknowledged that the two payments were similar because he claimed that he had refused the IBT's "car allowance because [he] took it from the Local Union." *Id.* Due to all of the foregoing evidence, the Chief Investigator argues not only that the IRB found that Giacumbo possessed the fraudulent intent necessary to establish the charge of embezzlement, but also that the evidence presented at the hearing amply supports that finding. *Id.*

In its opposition to Giacumbo's objections to Application XXV, the Government argues that Giacumbo's assertion that the 1995 IRB Opinion and Decision lacked a finding of fraudulent intent results from Giacumbo's misreading the IRB's decision. (Gov't App. XXV Letter at 6.) The Government asserts that the IRB made this precise finding when it found that "Giacumbo knowingly and intentionally accepted an aggregate of $1,600 in payments to which he knew he was not entitled." *Id.* (citing 1995 Opinion & Decision at 25).

Moreover, the Government maintains that "[t]he evidence relied upon by the IRB was more than sufficient to support the IRB's conclusion that Giacumbo acted with fraudulent intent." *Id.* The Government asserts that there is no dispute that, "from February through May 1992, Giacumbo received a monthly car allowance from the IBT while at the same time accepting reimbursement from Local 843 for his car expenses despite the fact that the IBT Constitution expressly requires that expenses paid by the IBT be 'in lieu of any similar payment by a subordinate body.'" *Id.* In addition, the Government claims that the IRB found Giacumbo's innocent explanations to be without credibility due to his demeanor and the numerous inconsistencies contained in his testimony. *Id.* The Government argues that, as the trier of fact, the IRB's credibility findings deserve substantial deference and should not be disturbed. *Id.* Finally, the Government urges this Court to ignore as irrelevant Giacumbo's claims of integrity due to his voluntarily relinquishing his Local salary when he was elected to the IBT and his refusal of a pay increase and the use of a union car. *Id.* at 7.

Article XIX, Section 7 of the IBT Constitution sets forth the "Grounds for Charges

Against Members, Officers and Subordinate Bodies." (IBT Const. Art. XIX, § 7); *Georgopoulos v. International Bhd. of Teamsters,* 942 F.Supp. 883, 898 (S.D.N.Y.1996). Among the conduct which constitutes a "basis for charges against members, officers, elected Business Agents, Local Unions, Joint Councils or other subordinate bodies for which he or it shall stand trial" is "[b]reaching a fiduciary obligation owed to any labor organization by any act of embezzlement or conversion of union's funds or property." (IBT Const. Art. XIX, § 7(b)(3)); *Georgopoulos,* 942 F.Supp. at 898. "It is well settled that to sustain a charge of embezzlement, the IBT 'must establish that the charged IBT member acted with fraudulent intent to deprive the union of funds.'" *Georgopoulos,* 942 F.Supp. at 898–99 (quoting *Wilson, Weber & Dickens,* 787 F.Supp. at 352); *See also United States v. International Bhd. of Teamsters [Salvatore],* 754 F.Supp. 333, 338 (S.D.N.Y. 1990). In addition, "circumstantial evidence can be used to prove fraudulent intent." *Georgopoulos,* 942 F.Supp. at 899; *Wilson, Weber & Dickens,* 787 F.Supp. at 352.

As this Court noted in *Georgopoulos,* this Court previously has affirmed internal IBT disciplinary actions against members charged with embezzlement based on circumstantial evidence. 942 F.Supp. at 899; *see also Wilson, Weber & Dickens,* 787 F.Supp. at 352; *Salvatore,* 754 F.Supp. at 338–39. In *Wilson, Weber & Dickens,* for example, the former President and Secretary–Treasurer of IBT Local 100 were disciplined for embezzlement because they failed to obtain the necessary Executive Board approval for charitable contributions made with Local 100 funds. 787 F.Supp. at 352. This Court affirmed the discipline imposed by the IBT on these individuals because

> [t]he evidence clearly demonstrated that the expenditures were made without Executive Board approval, in violation of Section 16(A) of the Local's bylaws. Dickens and Weber had an affirmative duty to obey their oath of office and to obey Section 16(A) and the by-laws. Dickens' and Weber's failure to comply with Section 16(A) gives rise to an inference of fraudulent intent.

*Id.*

On appeal, the Second Circuit affirmed these findings. The court explained that, "[b]ecause embezzlement is a specific intent offense, a defendant may not be said to have a fraudulent intent when there is a finding that he has a 'good faith belief both that the funds were expended for the union's benefit and that the expenditures were authorized (or would be ratified) by the union.'" *United States v. International Bhd. of Teamsters [Wilson, Weber & Dickens],* 978 F.2d 68, 72 (2d Cir.1992). The Second Circuit continued that "[i]t was not arbitrary and capricious for the [union] here to discredit the good-faith assertions of Weber and Dickens" because numerous factors undermined Weber's and Dickens' credibility. *Id.* at 73. These factors included: (1) the "detailed union bylaws and accounting rules that explicitly require executive board approval for charitable expenditures"; (2) Weber's and Dickens' "aware[ness] of past abuses within the IBT"; (3) the minutes of the local's executive board meeting that conflicted with Weber's and Dickens' explanation of the expenditures in question; and (4) the union's belief that some of these expenditures were "really personal entertainment." *Id.*

To reiterate, in the case at bar Giacumbo raises two objections to the IRB's finding that he embezzled $1,600 in car allowances from the IBT International: (1) that the IRB failed to find on the record that Giacumbo possessed fraudulent intent; and (2) that the IRB ignored evidence militating against a finding of fraudulent intent. This Court finds that both of these challenges are utterly meritless.

First, as the Government correctly points out, the IRB's 1995 Opinion and Decision specifically states that "Giacumbo knowingly and intentionally accepted an aggregate of $1,600 in payments to which he knew he was not entitled." (1995 IRB Opinion & Decision at 25.) This Court cannot imagine a much clearer statement of a finding of fraudulent intent. That the IRB declined to recite in its decision the specific words "fraudulent intent" does not mean that the IRB failed to

find such intent on the record. As a result, this Court finds that the IRB stated for the record its finding that Giacumbo possessed the specific intent necessary to establish his embezzlement of $1,600 in car allowances.

Second, Giacumbo's argument that the IRB ignored evidence negating a finding of fraudulent intent asks this Court to reweigh the evidence presented to the IRB. This Court's role in reviewing IRB decisions is not to second guess the IRB's factual determinations—as factfinder, the IRB's findings are entitled to substantial deference. *See Friedman & Hughes,* 905 F.2d at 616. Accordingly, this Court cannot determine the IRB's findings to be arbitrary and capricious simply because Giacumbo wishes that the IRB had placed more weight upon the evidence he claims to be in his favor. As a result, this Court finds meritless Giacumbo's claim that the IRB ignored evidence of his foregoing his Local 843 salary, a pay raise, and a union automobile militate against a finding of fraudulent intent. Moreover, even if the IRB believed the evidence regarding these claims, Giacumbo's episodes of selflessness unrelated to the instant embezzlement charges are insufficient to render the IRB's findings arbitrary and capricious.

In addition, this Court finds that the IRB was presented with sufficient evidence to find that Giacumbo possessed fraudulent intent when he embezzled $1,600 in car allowances. At the hearing, the Chief Investigator established—and Giacumbo did not challenge—Giacumbo's receipt of car allowances from both Local 843 and the IBT International from February through May 1992. Giacumbo, however, testified at the hearing that he did not know that he received double car payments during the months he received them. The IRB discredited Giacumbo's testimony, stating that "we do not accept that he was ignorant of his own actions." (1995 IRB Opinion & Decision at 25.) Like the Second Circuit in *Wilson, Weber & Dickens,* this Court finds that it was not arbitrary or capricious for the IRB to discredit Giacumbo's assertions of innocence because numerous factors undermine his credibility.

In determining that Giacumbo's testimony was unworthy of belief, the IRB made a specific finding that Giacumbo's "multiple inconsistencies ... regarding the overlapping car payments are best explained by [his] need to adjust sworn testimony to meet whatever seems to serve [his] needs ... at a particular moment." (1995 IRB Opinion & Decision at 26.) For example, at his September 1994 sworn examination, Giacumbo denied knowing that he received the IBT car allowance from the IBT. *See* (IRB Report at Exh. 1, at 175–81.) Conversely, Giacumbo testified at his May 1995 IRB hearing that in 1992, he asked the IBT to stop paying him his car allowance. In addition, Giacumbo's IBT pay stubs during February to May 1992 each contained a notation that he was paid a $400 car allowance. In light of the Giacumbo's internally inconsistent testimony, as well as the documentation on his paystubs establishing his receipt of the IBT International car allowance, this Court is unable to find that the IRB's decision to discredit Giacumbo's testimony was arbitrary and capricious.

Moreover, this Court finds that Giacumbo's argument that the IBT car allowance and the Local 843 car expense payments were not "similar payments" within the meaning of Article V, Section 1(e) of the IBT Constitution to be specious as well. To reiterate, that provision of the IBT Constitution mandates that "[a]ll allowances and expenses paid to the [IBT] International Union shall be *in lieu of any similar payment of a subordinate body* or affiliate." (IBT Const. Art. V, § 1(e) (emphasis added).) At his IRB hearing, however, Giacumbo did not testify that the payments he received from the Local and from the IBT International were distinct payments intended to be used for different purposes. Instead, Giacumbo raised this claim only after the IRB hearing. *See generally* (Tr.); (1995 IRB Opinion & Decision at 26 n. 43.) Nevertheless, in its 1995 IRB Opinion and Decision, the IRB considered and rejected this argument. (1995 IRB Opinion & Decision at 26 n. 43.) This Court finds that that rejection was not arbitrary and capricious. The IRB first found that Giacumbo previously testified at his sworn examination that he refused the IBT's "car allowance because [he] took it from the Local Union." (IRB Report at

Exh. 1, at 177–80.) Although Giacumbo offered no testimony on this point at his hearing, the IRB determined that the payments were in fact "similar" based upon this statement and Giacumbo's testimony at the hearing that he attempted to renounce the IBT International car allowance because of the Local car payments. (1995 IRB Opinion & Decision at 26 n. 43.) Because the IRB's decision is well-grounded on all of the foregoing evidence, this Court cannot conclude that the IRB's decision was arbitrary and capricious. Accordingly, this Court finds that the IRB's determination that Giacumbo embezzled $1,600 should be affirmed.

*b. Bylaw Violations*

Giacumbo asserts that the 1995 IRB Opinion and Decision "groups miscellaneous actions by Mr. Giacumbo as evidence of a 'pattern of violating provisions of the Local Bylaws, the IBT Secretary Treasurer's Manual and the IBT Constitution.'" (App. XXV Objections at 13.) Giacumbo argues that "[t]aken individually or collectively, the actions[ ] fail to support the pattern of conduct suggested by the IRB." *Id.* Specifically, Giacumbo takes issue with the IRB's determination that Giacumbo committed misconduct with regard to four actions: (1) purchasing computers for Local 843; (2) purchasing a laptop computer from Local 843; (3) charging personal expenses on Local 843's American Express card; and (4) signing Local 843 checks with only one, rather than two, signatures. *Id.* at 13–19. Each of these challenged actions will be considered individually.

*i. Purchasing Computer Equipment For Local 843*

In support of his assertion that he breached no provision of Local 843's Bylaws by purchasing computer equipment for the Local, Giacumbo claims that the IRB ignored several mitigating factors in finding that his purchases of computer equipment were improper. *Id.* at 13–14. First, Giacumbo contends that these purchases were made "with the knowledge and approval of the Local's [E]xecutive [B]oard," and "amounted to a fraction of the total annual disbursements of the Local, which in 1991 alone amounted to over $800,000." *Id.* at 14. Because of the "comparatively low cost" of the computers, Giacumbo asserts that he "understandably viewed it as a routine" purchase which, according to Article V, Section 5.01(A)(8) of the Local 843 Bylaws, did not require general membership approval. *Id.*

Second, Giacumbo asserts that his decision not to submit the computer purchases to a membership vote "must be read against the broad authority granted in the Bylaws to both the Local's president and Executive Board." *Id.* at 14–15. Specifically, Giacumbo directs this Court's attention to Article V, Section 5.01(A)(17) and Article IV, Section 4.02(H) of the Local 843 Bylaws. *Id.* Article V, Section 5.01(A)(17) grants the Executive Board the authority to "[d]o all acts, not expressly authorized herein, which are necessary or proper in implementation of the above for the protection of the property of the Local or for the benefit of the organization and members." *Id.* Article IV, Section 4.02(H) grants the President of the Local the "authority to interpret the[ ] Bylaws and to decide all questions of law thereunder, between meetings of the . . . Executive Board." *Id.;* (IRB Report at Exh. 19, at 7.) Giacumbo argues that these provisions empowered him to purchase computers in an effort to modernize the Local's offices and to "revive the membership's moribund involvement in the Local's affairs" by, *inter alia,* publishing a newsletter. (App. XXV Objections at 15–16.) "Under these circumstances," Giacumbo contends, the 1995 IRB Opinion and Decision "truly strains in finding a violation of the Local's Bylaws in the purchase of the computer equipment." *Id.* at 16.

In opposition to Giacumbo's challenge to the IRB's determination that he violated the Local's Bylaws by purchasing computer equipment, the Chief Investigator asserts that the IRB's finding was supported by the evidence. (CI Memo at 20–23.) The Chief Investigator argues that, although Article V, Section 5.01(A)(8) of the Local Bylaws permits the Executive Board to make "routine expenditures not of a substantial nature" without membership approval, Giacumbo's purchases of over $15,000 in computer

equipment between June 1991 and October 1992 were not "routine." *Id.* at 20–21. The Chief Investigator argues not only that the members were not notified of the plan to make a non-routine purchase of the computer equipment, but also that the minutes of the Executive Board meetings do not show "any specific Executive Board approval for the purchase." *Id.* at 21. Moreover, because the IRB found no evidence that the Local's membership either was notified or approved of the expenditures for computer equipment, the IRB properly found that Giacumbo violated the Local 843 Bylaws.

The Government offers the identical argument in opposition to each of Giacumbo's challenges to the Local 843 Bylaws which the IRB found he violated. (Gov't App. XXV Letter at 5.) The Government points out that Giacumbo's only "response to these charges is not to deny them but to attempt to downplay the violations as 'marginal.'" *Id.* The Government contends that, as an officer of the Local, Giacumbo had an "unqualified duty" to obey the Bylaws. *Id.* at 5–6. Thus, Giacumbo's failures to obey the Bylaws constitute violations of the Bylaws, regardless of Giacumbo's perception or characterization of the severity of these acts. *Id.* The Government asserts that the IRB's findings that Giacumbo violated the Bylaws was supported by the evidence presented to it, and thus, was not "arbitrary and capricious" *Id.* at 5–6.

To reiterate, this Court must grant substantial deference to the IRB's factual determinations. *See Friedman & Hughes,* 905 F.2d at 616. Accordingly, this Court will overturn IRB findings only when this Court determines that they are, based on all of the evidence before the IRB, "arbitrary and capricious." *See Sansone,* 981 F.2d at 1368.

This Court finds that the IRB's determination that Giacumbo violated the Local Bylaws by not obtaining membership approval of the purchase of the computer equipment was not arbitrary and capricious. The evidence presented to the IRB amply supports its findings that: (1) the expenditures for the computer equipment were neither "routine" nor "not of a substantial nature"; and (2) that Giacumbo never obtained "specific authorization at a membership meeting" for the computer purchases.

Article V, Section 5.01(A)(8) of the Local 843 Bylaws provides the Executive Board with the authority to

> [l]ease, purchase, or otherwise acquire in any lawful manner for and on behalf of the organization, any and all real estate or other property, rights and privileges, whatsoever deemed necessary for the prosecution of its affairs, and which the organization is authorized to acquire, at such price or consideration and generally on such terms and conditions as it thinks fit, and at its discretion pay therefor either wholly or partly in money or otherwise; *specific authorization at a membership meeting shall be required for such expenditures, excepting for routine expenditures not of a substantial nature[.]*

(IRB Report at Exh. 19, at 17 (emphasis added).) The IRB found that, while he was Local 843 President, "Giacumbo caused the Local to purchase computer equipment in the total amount of approximately $15,752.34." (1995 IRB Opinion & Decision at 16.) This Court finds that the IRB had sufficient evidence to find that this sum was neither "routine" nor "not of a substantial nature." The minutes from the Local's Executive Board meeting of May 17, 1990, suggest that, prior to Giacumbo's purchase of the equipment, at least one member of the Executive Board was concerned about the proposed cost of the computer equipment. The minutes of that meeting include the following exchange:

> The computer estimate came in at about $25,000 which *Bro. Goodwin expressed concern why didn't the Pres. come back to the board members before a deposit was sent.* Bro. Heath made a motion to buy the estimated system from Ocean Computers. 2nd by Bro. Chambers. For—F. Chambers, R. Heath, Against—D. Goodwin, G. Nelson, C. Modzelski, Abstain, D. Kuffer. *Bro. Nelson made a motion to price a comparative system. 2nd by Sister Kuffer. Passed unanimously.*

(IRB Report at Exh. 11, at 230 (emphasis added).) As these minutes reflect, Giacumbo's fellow Executive Board members expressed concern about the amount of the

proposed expenditure for computer equipment and, as a result of their concern, unanimously voted to obtain additional price estimates for the equipment. *Id.* This Court finds that this excerpt provides evidence that the eventual expenditure of $15,752.34 was not routine. In addition, the very fact that Giacumbo undertook to computerize an office which previously had no computers substantiates the non-routine nature of this purchase. Accordingly, this Court finds that the IRB's finding that Giacumbo's computer equipment purchase was not routine was not arbitrary or capricious.

Having found that the computer purchase was not routine, Article V, Section 5.01(A)(8) of the Local Bylaws requires the Executive Board to obtain "specific authorization at a membership meeting" before such a purchase can be made. This Court finds that the IRB's determination that Giacumbo did not obtain such authorization prior to purchasing the equipment was not arbitrary or capricious. Indeed, not only was the Local members' "specific authorization" never secured, but the IRB determined that the Local 843 members were not even on notice of the computer purchase. (1995 IRB Opinion & Decision at 17–18.) The IRB found that the Executive Board voted at its February 15, 1990, meeting "to computerize the office," but that the minutes of this meeting were never read to the members. *Id.* In fact, the IRB found that "the Executive Board minutes did not reflect any Executive Board approval of the actual purchase." *Id.* at 18 n. 29. This Court thus finds that the IRB's conclusion that Giacumbo did not obtain membership approval for the computer purchase was not arbitrary or capricious.

This Court further finds that none of Giacumbo's arguments to the contrary are persuasive. Giacumbo feebly claims that the computer purchase was routine because the $15,000 was a "fraction" of the Local's annual budget of $800,000. (App. XXV Objections at 14.) This Court notes the absurdity of the wording of Giacumbo's argument, as presumably the Local does not allocate its entire yearly budget to a single expenditure, and thus *all* of its purchases constitute a "fraction" of its annual budget. Despite this poor word choice, this Court discerns the core of Giacumbo's claim to be that $15,000 is a negligible portion of $800,000, and thus, the computer purchase was routine under the Local Bylaws and needed no membership approval. This Court need not express its view regarding whether an allocation of two percent of the Local's annual budget is "routine." Under the Consent Decree, this Court is charged only with determining whether the IRB's finding that Giacumbo's $15,000 computer purchase was not routine was arbitrary and capricious. *See Friedman & Hughes,* 905 F.2d at 616. Based on the evidence presented to the IRB, this Court finds that the IRB's determination was not arbitrary and capricious.

Moreover, Giacumbo comes forward with no evidence of membership approval for the computer purchases. Without such evidence, all of his remaining arguments are meaningless. First, whether Giacumbo made the equipment purchase "with the knowledge and approval" of the Executive Board, (App. XXV Objections at 14), is immaterial. It is the approval of the Local's membership—not the Executive Board—which was necessary to validate Giacumbo's purchase. Second, Giacumbo tests his already strained credibility when he argues that his decision not to submit the computer purchases to a membership vote "must be read against the broad authority granted in the Bylaws to both the Local's President and Executive Board." *Id.* While it is obvious that one provision of the Bylaws is to be read in the context of the entire document, it simply cannot be the case that one provision renders another superfluous. Nevertheless, by asking this Court to find that Giacumbo had the "broad authority" to purchase $15,000 in computer equipment for an office that previously had no computers, Giacumbo asks this Court to render meaningless the Bylaw's requirement that all non-routine expenditures be made with membership approval. This Court refuses to do so. As a result, this Court finds that the IRB's determination that Giacumbo violated Article V, Section 5.01(A)(8) of the Local 843 Bylaws was not arbitrary or capricious.

*ii. Purchasing a Laptop Computer From Local 843*

Giacumbo also objects to the IRB's finding that he violated the Local Bylaws by pur-

chasing from Local 843 a "superannuated lap top computer" for $1,000 for his personal use. *Id.* at 16. Giacumbo asserts that the amount he paid for the laptop was "a price higher by $200 than that suggested in any of the estimates he secured." *Id.* Giacumbo asserts that his purchase of the laptop "specifically was approved by Local 843's Executive Board and appropriately reported in the records of the Local and [IBT]." *Id.* Finally, Giacumbo argues that "to suggest that a sale of this low magnitude, at an above-market price, violated the Locals' Bylaws because it was not first placed for a vote before the general membership exalts form over substance." *Id.*

In opposition to Giacumbo's objection, the Chief Investigator asserts that, even though Giacumbo obtained Executive Board approval for his purchase of the laptop, Article V, Section 5.01(A)(9) of the Bylaws requires the sale of the Local's property to be approved by the Local's members, but that Giacumbo never obtained the members' approval of his laptop purchase. (CI Memo at 22–23.) In addition, the Chief Investigator points out that the minutes of the Executive Board meeting which approved Giacumbo's laptop purchase were never read at a membership meeting, and that two Executive Board members testified that "the Local's members did not approve the sale of the computer equipment to Giacumbo." *Id.* at 23.

As with all of Giacumbo's objections to the IRB's findings that he violated the Local 843 Bylaws, the Government characterizes as irrelevant Giacumbo's assertions that he should not be held accountable for his *de minimis* Bylaw violations. (Gov't App. XXV Letter at 5.) In this instance, however, the Government takes issue specifically with Giacumbo's statement that requiring him to obtain membership approval for his laptop purchase "exalts form over substance." *Id.* The Government asserts that the IRB "properly rejected Giacumbo's rationalizations for his failure to abide by the requirements of the IBT Constitution and the Local's Bylaws." *Id.*

Pursuant to Article V, Section 5.01(A)(9) of the Local 843 Bylaws, the Executive Board has the authority to:

> Sell or dispose of any real or personal estate, property, rights or privileges belonging to the organization, whenever in its opinion the Local Union's interests would be thereby promoted, *subject to approval (except as to form) at a membership meeting[.]*

(IRB Report at Exh. 19, at 17) (emphasis added.) The IRB determined that Giacumbo violated this provision by failing to secure membership approval prior to purchasing the computer equipment. (1995 IRB Opinion & Decision at 20.) This Court finds that there was sufficient evidence supporting this finding to precluded this Court from finding that the IRB's decision was arbitrary or capricious.

The IRB determined that in December 1992, after losing the Local 843 election, Giacumbo purchased a laptop computer and associated printer from Local 843 for $1,000 with Executive Board approval. (1995 IRB Opinion & Decision at 19.) Giacumbo paid more for the computer than it was valued by two appraisers. *Id.* The IRB was presented with evidence that, although the Executive Board approved the sale, the members never approved it. *Id.* Giacumbo failed to offer evidence that he obtained—or even attempted to obtain—membership approval for his purchase. As a result, this Court finds that IRB's determination that Giacumbo's purchase of the laptop violated the Local 843's Bylaws was not arbitrary and capricious.

Moreover, this Court notes that Giacumbo's argument that holding him accountable for his computer purchase "exalts form over substance" is symptomatic of the very conduct which brings Giacumbo before this Court. By first making unauthorized purchases of computers for the Local with the Local's funds and then buying a portion of it back for his personal use without the membership's approval, Giacumbo flagrantly engaged in self-dealing. The Bylaw provisions which require membership approval before officers may take certain actions—such as buying and selling Local property—are designed in part to eliminate self-dealing by the officers. For Giacumbo to argue that finding such conduct to be in violation of the Bylaws is to exalt "form over substance" demon-

strates that Giacumbo fails even to recognize the prohibited conduct which forms the substance—not merely the form—of the Bylaws. Similarly, Giacumbo's continued minimalization of his violations manifests a lack of acceptance of responsibility and an arrogance of power that this Court finds astonishing for an individual facing such incriminating—and unchallenged—evidence. In the face of such evidence, this Court cannot find arbitrary and capricious the IRB's determination that Giacumbo's laptop purchase violated the Local's Bylaws.

*iii. Charging Personal Expenses on Local 843's American Express Card*

Although Giacumbo groups this issue with his Bylaw violations, the IRB found that he violated the IBT Secretary–Treasurer's Manual—not the Local 843 Bylaws—by charging personal expenses on the Local's American Express card. *See* (1995 IRB Opinion & Decision at 20–21.) Nevertheless, because Giacumbo organizes his objections in this fashion, this Court will consider this objection along with Giacumbo's challenges to his Bylaw violations.

Giacumbo objects to the IRB's determination that he violated the IBT Secretary–Treasurer's Manual by charging approximately $800 in personal expenses on the Local's American Express card. (App. XXV Objections at 16–17.) Giacumbo offers five reasons for his objection on this issue. First, Giacumbo contends that "the precise purpose of these expenditures is difficult to reconstruct given the passage of time and the fact that the original records, which contained contemporaneous notations by Mr. Giacumbo as to their purpose, are missing, apparently taken by political opponents at the Local." *Id.* at 17. Second, Giacumbo asserts that "[n]otwithstanding his inability to review the original records of the American Express charges in issue, Mr. Giacumbo's testimony at the hearing firmly supports the view that many of the expenditures arguably were related to union business and could properly have been so classified." *Id.*

Third, Giacumbo claims that he submitted the American Express receipts to the Local's bookkeeper with notations that they were personal expenses, and thus, there is no basis for the IRB's finding that Giacumbo repaid the expenses only "after the filing of charges against other local members." *Id.* at 17–18. Fourth, Giacumbo depicts as significant the fact that the IRB's 1995 Opinion and Decision "contains no suggestion that Mr. Giacumbo ever failed to reimburse the Local for expenses that were deemed personal." *Id.* at 17 n. 6. Fifth, Giacumbo asserts that the record provides no support for the IRB's finding that his actions violated the IBT's regulations, especially since the IBT failed to take any action regarding Giacumbo's personal expenses. *Id.* at 18.

In opposition to Giacumbo's objections regarding his American Express charges, the Chief Investigator points out that "[o]n ten occasions in 1992[,] Giacumbo charged a total of $824.60 in personal charges on Local 843's American Express card and later reimbursed Local 843 for these expenses." (CI Memo at 23.) The Chief Investigator argues that, "[b]y charging personal expenses" to the Local's credit card, Giacumbo violated Section 4.1 of the IBT Secretary Treasurer's Manual which state[s] [that] "*[u]nder no circumstances* should personal expenses be charged to and/or run through the Local Union books." *Id.* at 24 (emphasis added).

Once again, the Government simply argues that Giacumbo's "attempt to downplay" his violations does not carry his burden of establishing that the IRB's findings were "arbitrary and capricious." (Gov't App. XXV Letter at 5–6.) Instead, the Government maintains that a violation, no matter how small Giacumbo views it, is still a violation of a Bylaw or regulation by which he is bound to abide. *Id.* at 5.

In its 1995 Opinion and Decision, the IRB found that in 1992, Giacumbo charged $824.60 in personal expenses on Local 843's American Express card. (1995 IRB Opinion & Decision at 20.) The IRB sets forth the charges it alleges were personal, and notes that virtually all of these charges were to restaurants near Giacumbo's home in Sea Bright, New Jersey, and that Giacumbo reimbursed the Local for many of these meals. *Id.* at 20–21 n. 34. In addition, the IRB points out that for several of Giacumbo's

reimbursements, he noted that the reimbursement was for his personal use of the card, including several which read: "Gene Giacumbo—personal use of Amex card." *Id.* As a result, of these personal charges, the IRB determined that Giacumbo violated Section 4.1 of the Secretary–Treasurer's manual which provides: "[U]nder no circumstances should personal expenses be charged to and/or run through the Local Union books." *Id.* at 21; (IRB Report at Exh. 64.) In addition, the IRB noted that the Secretary–Treasurer's Manual was available at Local 843's offices. *Id.* at 21 n. 35.

This Court finds that the IRB's determination that Giacumbo violated Section 4.1 of the Secretary–Treasurer's Manual was not arbitrary or capricious. The evidence presented to the IRB establishes that Giacumbo charged on the Local's American Express card many meals at restaurants near his home, and that he reimbursed the Local for them. Moreover, Giacumbo submitted receipts stating that they were for personal expenses. Such conduct unequivocally contravenes the clearly worded prohibition contained in Section 4.1 of the Secretary–Treasurer's Manual: *"[U]nder no circumstances* should personal expenses be charged to an/or run through the Local Union books." (IBT Secretary–Treasurer's Manual, § 4.1.) Accordingly, this Court finds that the IRB's determination that Giacumbo charged personal expenses to the Local's American Express card was not arbitrary and capricious.

Giacumbo's arguments to the contrary do not require a different conclusion. First, even if time has rendered it difficult to reconstruct the "precise purpose" of the charges, the IRB was presented with sufficient evidence so that this Court may not conclude that its finding that these expenses were personal was arbitrary or capricious. One example of this evidence is Giacumbo's reimbursements which read "Gene Giacumbo—personal use of Amex card." This Court cannot imagine that the IRB would need more evidence to find that Giacumbo charged personal expenses on his Local 843 American Express card. Second, Giacumbo's testimony at the hearing that *one* of the dinners he charged was "occasioned by legitimate union business" does not mean that none of the many other charges were personal. Third, Giacumbo's claim that there is no basis for the IRB's finding that he reimbursed the Local only after several other Local members were charged with charging personal expenses to the Local is irrelevant. Whether Giacumbo reimbursed the local at all for his personal expenses matters not at all to the issue of whether he charged personal expenses to the Local to begin with. It is the charging that is forbidden by Section 4.1 of the Secretary–Treasurer's Manual, not the charging of personal expenses without reimbursing the Local for them.

Giacumbo's fourth objection fails for the same reason. Giacumbo asserts that the IRB's opinion did not state that he failed to reimburse the Local "expenses that were deemed personal." Giacumbo, however, violated the Secretary–Treasurer's Manual the moment he charged a personal expense on the Local's charge card—his subsequent reimbursement of the Local for the expense has no curative effect on this violation. Indeed, this Court finds his reimbursement to provide even more evidence supporting the IRB's finding that these expenses were personal. Finally, Giacumbo's argument that the record does not support the IRB's finding that his personal charges violated a regulation of IBT is entirely frivolous. Just because his personal charges did not violate an IBT regulation does not mean that it did not violate Section 4.1 of the Secretary–Treasurer's Manual. Accordingly, this Court finds that the IRB's determination that Giacumbo charged personal expenses to the Local's American Express card was not arbitrary and capricious.

*iv. Obtaining Only One Signature on Local 843 Checks*

Giacumbo objects to the IRB's finding that he violated Local 843's Bylaws by issuing checks which did not contain the two signatures required by Article IV, Section 4.02(E) of the Local 843 Bylaws ("Section 4.02(E)"). (App. XXV Objections at 18–19.) Giacumbo contends that he was first advised against the practice of signing only his own name on Local checks on February 20, 1991. *Id.*

Giacumbo claims that "[c]onspicuously absent from the [IRB's] Opinion & Decision is the fact that during the 22 months remaining in Mr. Giacumbo's term of office following that letter, the Chief Investigator's Office was able to identify only 16 checks that were issued bearing only one signature," even though Giacumbo "signed on the average 90 checks each month, or an estimated total of 2,000 checks." *Id.* at 19.

Based on these sixteen checks, Giacumbo makes two objections to the IRB's finding that he breached the Local's Bylaws. First, Giacumbo maintains that "seven [checks] were drawn on the Local's general operating account at First Fidelity Bank," and only two of these were payable to Giacumbo "for salary or vacation pay during the fall of 1991." *Id.* Giacumbo asserts that "[n]o evidence was adduced questioning the legitimacy of any of these payments, including those to Mr. Giacumbo." *Id.* Thus, regardless of the manner in which the checks were issued, Giacumbo claims that the IRB's determination that he violated the Local's Bylaws was arbitrary and capricious because the payments represented by these checks were legitimate. *Id.*

Second, Giacumbo contends that the "remaining nine checks ... were drawn on Cowan, a private money management account[ ] which collected interest from the Local's investment portfolio." *Id.* at 20. Giacumbo was authorized by the Local to be the sole signatory on the Cowan account. *Id.* Giacumbo claims that "[b]ecause the Cowan account was not maintained at a bank, and no disbursements were made from it," Giacumbo contends that he did not "view[ ] it as falling within the purview of ... [Section] 4.02(E) ... which requires a second signature on checks drawn from, *inter alia*, a 'bank account.' " *Id.* (citations omitted). Accordingly, Giacumbo maintains that "while this interpretation [of Section 4.02(E) ] is subject to debate, Mr. Giacumbo's practice of endorsing the Cowan checks with only one signature falls far short of an intentional violation of the Local's Bylaws as found by the IRB." *Id.*

The Chief Investigator maintains that the hearing evidence supports the IRB's determination that Giacumbo violated the Local's Bylaws by signing only his own name on the Local's checks as well as "on an account he caused the Local to open with Cowan & Co." (CI Memo at 34–35.) However, the Chief Investigator looks to a different Bylaw provision than Giacumbo, and argues that Giacumbo's issuing checks, including the Cowan checks, with one signature violated Article IV, Section 4.02(D) ("Section 4.02(D)") (rather than Section 4.02(E)) of the Local Bylaws. *Id.* at 35.

The Government again argues that Giacumbo's assertions that his *de minimis* violations do not warrant sanctions are irrelevant because of Giacumbo's "unqualified duty" to abide by the Bylaws. (Gov't App. XXV Letter at 5.) According to the Government, simply because a violation is minor does not render arbitrary and capricious the IRB's determination that a violation occurred. *Id.* at 5–6.

This Court begins by noting that, while Giacumbo bases his claim on Section 4.02(E), the IRB, the Chief Investigator and the Government all rely upon Section 4.02(D). Indeed, in the 1995 IRB Opinion and Decision, the IRB determined that Giacumbo breached Section 4.02(D), and never even mentioned Section 4.02(E). *See generally* (1995 IRB Opinion & Decision.) Nevertheless, this Court will discuss Giacumbo's arguments as they apply to both provisions. Section 4.02(D) provides:

> *The President,* subject to the provisions of Article XXIII, Section 3 of the International Constitution, *together with the Secretary–Treasurer shall sign all official documents,* deeds, mortgages, bonds, contracts or other instruments, *all checks drawn on bank accounts,* and performs such other duties as the International Constitution, these Bylaws or law may require of him.

(IRB Report at Exh. 19, at 6 (emphasis added).) Section 4.02(E) provides:

> *The President, in conjunction with the Secretary–Treasurer* shall have the authority to disburse or order the disbursement of all monies necessary to pay the bills, obligations and indebtedness of the Local Union, which have been properly incurred as provided herein. He shall have the

authority to pay current operations expenses of the Local Union, including rents, utilities and maintenance of the Union Hall, and salaries and expenses of officers and employees.

*Id.* at 6–7 (emphasis added).

This Court finds that the IRB's determination that Giacumbo violated Article IV, Section 4.02(D) of the Local Bylaws was not arbitrary or capricious. The IRB was presented with *seven* checks drawn on First Fidelity Bank which Giacumbo signed alone, *two* of which Giacumbo made payable to himself. *See id.* at Exhs. 50 & 83. This evidence alone provides a sufficient basis for this Court to find that the IRB's determination on this issue was not arbitrary or capricious. Contrary to Giacumbo's first argument, the legitimacy of the payments for which these seven checks were written is simply irrelevant to the issue of whether he violated Section 4.02(D). Giacumbo's logic suggests that Section 4.02(D) permits the President alone to sign checks for legitimate payments, but demands that checks be signed by both the President and the Secretary–Treasurer only where the payments are improper. This reasoning is not only laughable in its substance, it is contrary to the text of Section 4.02(D). As a result, this Court finds that the IRB's determination that, by issuing seven checks drawn on First Fidelity Bank with only his signature Giacumbo breached Section 4.02(D), was not arbitrary or capricious.

Having found that the IRB received sufficient evidence to sustain the charge that Giacumbo breached Section 4.02(D) of the Local Bylaws on seven separate occasions, this Court need not address Giacumbo's argument that the IRB could not find that he violated Article IV, Section 4.02(E) of the Local Bylaws based on the nine checks Giacumbo drew on the Cowan account because it is not a "bank account" within the meaning of Section 4.02(E) (the "bank account argument"). This Court notes, however, that it appears that Giacumbo mistakenly cited Section 4.02(E)—rather than Section 4.02(D)—because the former provision makes no reference to "bank accounts." *See generally* (IRB Report at Exh. 19, at 6.) Nevertheless, if this Court were to resolve Giacumbo's bank account argument, which it does not, it appears that the argument would fail under either Section 4.02(D) or Section 4.02(E).

Section 4.02(D) demands that the Local Union President, "together with the Secretary–Treasurer" sign "all official documents . . . or other instruments, [and] all checks drawn on bank accounts." (IRB Report at Exh. 19, and 6.) Even assuming *arguendo* that Giacumbo is correct in claiming that the Cowan account was not a "bank account" within the meaning of Section 4.02(D), it is not at all clear that a check drawn on the Cowan account is neither an "official document" nor an "other instrument" requiring two signatures under Section 4.02(D). Accordingly, this Court finds Giacumbo's argument flawed.

Similarly, Section 4.02(E) grants the Local Union President the authority to disburse the Local's funds for certain, specified purposes. That provision, however, expressly states that the President may exercise that authority only "in conjunction with the Secretary–Treasurer." *Id.* at 6. In the instant case, Giacumbo has made no showing that any of the nine Cowan checks he issued without the proper signatures were for any of the purposes within Section 4.02(E). Furthermore, because these checks were issued with Giacumbo's signature only—not the Secretary–Treasurer's signature—each one of the checks appears to violate Section 4.02(E), which required Giacumbo to disburse funds only "in conjunction with the Secretary–Treasurer." Consequently, Giacumbo's reliance on Section 4.02(E) is misplaced not only because he was not charged with violating it, but also because it appears that he did, in fact, breach its express terms.

c. *The Allways Organizing Attempt*

Giacumbo challenges the sufficiency of the evidence supporting the IRB's "bizarre" finding in Charge One that he brought reproach upon the IBT and violated the IBT International Constitution by attempting to organize the Allways employees. (App. XXV Objections at 20.) He asserts that neither of the IRB's two findings regarding the Allways organization—that it was: (1) a "thinly veiled

attempt at a vote[-]packing scheme designed to insure Mr. Giacumbo's re-election"; and (2) a way for Allways to gain an advantage in securing an IBT travel contract—is supported by the evidence. *Id.* at 21. Instead, Giacumbo maintains that "the Allways employees were organized consistent with traditional and laudable objectives of the union movement." *Id.*

In support of his assertion that the IRB arbitrarily and capriciously found that the Allways employees were recruited to enhance Giacumbo's reelection efforts, Giacumbo makes two arguments. First, he claims that the IRB ignored Kuffer's and Giacumbo's hearing testimony to the contrary. *Id.* at 23. Giacumbo, however, neither states what this testimony is nor directs this Court to the appropriate transcript pages. Second, Giacumbo argues that, if his reason for recruiting the Allways members was to gain votes for himself, he could have obtained more Allways members than he did. *Id.* For example, Giacumbo claims that "although Allways employed between 12 and 15 individuals in varying capacities, only five were enrolled as [Local 843] members." *Id.* Moreover, Giacumbo asserts that he "disallowed the membership of a sixth [Allways employee] because she arguably was considered part of management." *Id.*

Giacumbo also claims that the IRB was arbitrary and capricious in finding that it was improper for him to have solicited the Allways employees in order to assist Allways in its IRB travel contract bid. *Id.* at 21. Giacumbo contends that Giacumbo's conduct was neither "remarkable nor sinister," because both Allways and its employees "shared a common interest in union representation, viz., the prospect of securing additional work from other Teamsters Locals[ ] [and] the [IBT]." *Id.* Giacumbo maintains that there is nothing untoward about the IBT's "awarding business to union employers," and notes the practice of both the IBT and IRB in using United Parcel Service, an IBT employer, as their overnight mail courier. *Id.* at 22. In addition, Giacumbo maintains that the IRB's "implied finding of illicit influence peddling by Mr. Giacumbo is altogether belied by the uncontested fact that when the Allways employees became members of Local 843, Mr. Giacumbo already had emerged as a vocal critic of the Carey administration and was in no position to influence a decision on the part of the General Executive Board." *Id.* In effect, Giacumbo claims that he had no influence to peddle because "a recommendation from Gene Giacumbo to Ron Carey is more like a kiss of death than an influence." *Id.*

The Chief Investigator argues that the IRB's determination that Giacumbo violated the IBT International Constitution was amply supported by the evidence. (CI Memo at 32–34.) First, the Chief Investigator contends that the hearing evidence supports the IRB's finding the Giacumbo solicited the Allways employees as Local 843 members to foster his own career, rather than to collectively bargain on their behalf. *Id.* at 33. Based on the evidence that there was no collective bargaining agreement between Allways and the Local, and that no grievances were processed by the Local for the Allways employees, the IRB found that Giacumbo and the Local engaged in no collective bargaining services for the Allways employees. *Id.* The Chief Investigator points out that, once the IRB determined that collective bargaining was not the basis for the Allways employees' relationship with Giacumbo and Local 843, it further determined that the actual basis for the relationship was "to promote the political career of Giacumbo." *Id.* This finding, the Chief Investigator maintains, "was fully supported by the evidence which included the fact that it was only shortly before the Local 1992 election and five months after the dues check-off authorization cards were signed that Giacumbo's personal friend Russo paid back dues for the Allways employees by personal check, thereby making them eligible to vote in the election." *Id.* Moreover, "within days after Giacumbo lost the 1992 election, each of the Allways employees withdrew from Local 843 membership." *Id.* at 33–34. Finally, the Chief Investigator notes that Giacumbo unilaterally waived the Allways' employees $150 initiation fee in contravention of Article IX, Section 9.01(B) of the Local 843 Bylaws. *Id.* at 34. As a result of this evidence, the Chief

Investigator argues that the IRB's decision was not arbitrary or capricious.

Second, the Chief Investigator argues that the IRB's finding that the Allways employees were recruited to the Local in order for Allways to gain an advantage in its IBT travel contract bid is supported by hearing evidence, including Giacumbo's own testimony. *id.* at 32. Giacumbo testified that "the Allways employees joined the Local to get an edge in bidding on the IBT travel contract." *Id.* In addition, the Chief Investigator notes the following facts adduced at the hearing which support the IRB's finding that Giacumbo's Allways organization attempt was a means for Allways to gain advantage in bidding for an IBT travel contract:

> [T]he Allways members signed dues check-off cards at a time when the IBT was accepting bids on its travel contract; after the check-off cards were signed, the Local's bookkeeper immediately obtained from the IBT a Titan employer code for Allways thereby informing the IBT that Allways was an IBT employer; the Allways employees did not pay dues until five months after they signed the check-off authorization cards; Giacumbo hand-carried the Allways bid on the IBT travel contract the IBT Secretary Treasurer and Giacumbo solicited other Locals to use Allways as its travel agency.

*Id.* at 32–33.

The Government asserts that Giacumbo's challenge to the IRB's finding that he brought reproach upon the union by organizing the Allways employees asks this Court to "reweigh the evidence against him [in] contraven[tion] [of] the well-established principle that the decisions of the IRB are entitled to great deference." (Gov't App. XXV Letter at 4.) The Government asserts that "[t]he IRB had ample evidence to reject Giacumbo's contention that he was engaged in appropriate employee organizing and to conclude that Giacumbo's effort with respect to Allways was a sham." *Id.* The Government cites the following evidence:

> [E]vidence of the personal relationship between Giacumbo and one of the Allways employees; the waiver of the initiation fee for them without [E]xecutive [B]oard approval; the fact that their union dues were far lower than any other members' dues; the fact that this purported organizing effort was in an area unrelated to the areas in which the other union members were employed; the timing of their dues check-off authorization to coincide with the bidding for the IBT travel contract; the fact that dues for all of the Allways employees were not paid by the employer from withheld funds, but rather were paid for with a personal check from Giacumbo's friend; the fact that the dues were paid five months after the dues check-off authorization but in time for the Allways employees to be eligible to vote in the Local election; the fact that no collective bargaining agreement was negotiated on their behalf with their employer; the brief period of the Allways employees' membership in the Local; and the fact that they withdrew from the union within weeks of Giacumbo's loss in the election.

*Id.* at 4–5. "Given th[is] abundance of evidence," the Government argues, "the IRB's conclusion that Giacumbo brought reproach upon the union in connection with allowing the Allways employees to join the Local was not arbitrary or capricious." *Id.* at 5.

In sustaining Charge One against Giacumbo, the IRB determined that he breached several provisions of the IBT Constitution as well as one provision of the Local 843 Bylaws. (1995 IRB Opinion & Decision at 10.) Article II, Sections 2.01(A)(2) and (3) of the Local 843 Bylaws provide:

> The objects of this Local Union shall be:
>
> (2) To unite into one labor organization all workers eligible for membership, regardless of religion, race, creed, color, national origin, age or sex;
>
> (3) To engage in organizing workers and to provide services to those who are organized[.]

(IRB Report at Exh. 19, at 3.) Article II, Section 2(a) of the IBT Constitution provides:

> *Each person upon becoming a member thereby pledges his honor: to faithfully observe* the constitution and laws of the International Brotherhood of Teamsters,

and *the Bylaws and laws of his Local Union;* to comply with all rules and regulations for the government of the International Union and his Local Union; to faithfully perform all duties assigned to him to the best of his ability and skill; to conduct himself or herself at all times in such a manner as not to bring reproach upon the Union . . . and at all times to bear true and faithful allegiance to the International Brotherhood of Teamsters and his Local Union.

(IBT Const. Art. II, § 2(a) (emphasis added)); (1995 IRB Opinion & Decision at 10–11 n. 15.) Finally, Article XIX, Sections 7(b)(1) and (2) of the IBT Constitution state:

*The basis for charges against members, officers,* elected Business Agents, Local Unions, Joint Councils or other subordinate bodies for which he or it shall stand trial *shall consist of,* but not be limited to, the following:

(1) *Violation of any specific provision of the* Constitution, *Local Union Bylaws* or rules of order, or failure to perform any of the duties specified thereunder.

(2) Violation of oath of office or of the oath of loyalty to the Local Union and the International Union.

(IBT Const. Art. XIX, §§ 7(b)(1), (2) (emphasis added)); (1995 IRB Opinion & Decision at 10–11 n. 15.)

This Court finds that the IRB's determination that Giacumbo brought reproach upon the union in his Allways organization attempt was not "arbitrary or capricious." In drawing this conclusion, the IRB first found that Giacumbo violated Article II, Sections 2.01(A)(2) and (3) of the Local 843 Bylaws. Once the IRB found those violations, it then found that Giacumbo violated Article II, Section 2(a) and Article XIX, Section 7(b)(1) and (2) of the IBT Constitution, each of which is triggered by an IBT member's violation of a Local Bylaw. This Court finds that none of these determinations by the IRB was "arbitrary or capricious."

First, the IRB determined that "the membership of the Allways employees was not solicited for any purpose within the purview of [Article II, Section 2.01(A)(2) and (3) of the Local 843 Bylaws]," (1995 IRB Opinion & Decision at 8), which is to "unite" and "organiz[e]" workers and to "provide services to those who are organized." Instead, the IRB determined that the Allways employees became Local 843 members to promote Giacumbo's political career and to facilitate Allways' IBT travel contract bid. The IRB was presented with substantial evidence to support both of these findings. In support of its first finding, the IRB heard testimony at that, after Giacumbo began a "personal relationship" with Russo, a travel agent at Allways, Giacumbo recruited approximately five Allways employees to the Local. *Id.* at 2. Giacumbo waived the initiation fee and "negotiated" a "favorable" dues rate for the Allways employees. *Id.* at 3. However, the Allways members did not actually pay their dues until five months after they became members. *Id.* Tellingly, Russo paid all of the members' dues with personal checks in the months of September, October and November 1992. *Id.* Russo's payments made the Allways members eligible to vote in the November 1992 meeting at which nominations for Local officers occurred, as well as in the Local election which was conducted by ballots mailed on November 12, 1992. *Id.* at 4. Within twenty days after Giacumbo lost the election on December 2, 1992, every one of the Allways members resigned from the Local. *Id.* The Local made no attempt to retain the Allways employees as members. *Id.* at 5. In light of this evidence, this Court cannot find "arbitrary or capricious" the IRB's determination that Giacumbo solicited the Allways' employees in order for them to vote for him in the 1992 election.

In addition, this Court finds that the IRB's second determination regarding the Allways organization attempt—that Giacumbo recruited the Allways employees in order to facilitate Allways' bid for an IBT travel contract—is adequately supported by the evidence. For example, Giacumbo himself testified that "there was certainly some concern on [the Allways employees'] part in being able to network into getting some [IBT] travel business." *Id.* In fact, Giacumbo stated at the hearing that the Allways employees' becoming Local 843 members was a precondition for his personal delivery of the Allways

bid to IBT Secretary–Treasurer Tom Sever. *Id.* Moreover, Local 843 Recording Secretary Deborah Kuffer testified that the ability to successfully bid on the travel contract was "the reason" the Allways employees became Teamsters. *Id.*

Critically, Giacumbo offered the IRB no evidence suggesting that he made any substantial collective bargaining efforts on the Allways employees' behalf. Indeed, the IRB found Giacumbo's testimony on this topic to be "remarkably sparse." *Id.* at 6. Giacumbo testified that the Allways employees, including Russo, were concerned about their health benefits package. *Id.* However, Local 843 never handled any grievances for the Allways members, nor did the Local ever appoint a business agent for the employees. *Id.* Most tellingly, however, is Giacumbo's testimony at the hearing that Local 843 conducted *no* formal negotiations on behalf of the Allways employees with their employer. *Id.* While Giacumbo claims to have had "sporadic" informal meetings with Allways, he was not even certain who he met at these meetings. (Tr. 339, 368.) Based on this evidence, this Court finds that the IRB's finding that Giacumbo recruited the Allways employees for reasons other than collective representation was not arbitrary or capricious.

As a result of its findings that (1) Giacumbo recruited the Allways employees for his own political benefit, and (2) that the Allways employees joined only to promote Allways' bid for the IBT travel contract, the IRB determined that Giacumbo violated Article II, Sections 2.01(A)(2) and (3) of the Local Bylaws. (1995 IRB Opinion & Decision at 7–8.) To reiterate, these provisions state that the objective of the Local is to organize workers in order to secure improved working conditions through collective bargaining. The IRB determined that Giacumbo's conduct breached these Bylaw provisions. Based on the foregoing evidence, this Court does not find this determination to be arbitrary or capricious.

Article II, Section 2(a) of the IBT Constitution requires each IBT member "to faithfully observe ... the Bylaws and laws of the Local Union." Article XIX, Section 7(b)(1) and (2) of the IBT Constitution provides that a proper basis for charges against an IBT member is a "[v]iolation of any specific provision of the ... Local Union Bylaws ... or failure to perform any of the duties specified thereunder." Each of these IBT Constitutional provisions is implicated when an IBT member violates a Local union bylaw. In the case at bar, this Court determined that the IRB's finding that Giacumbo breached Article II, Sections 2.01(A)(2) and (3) of Local 843 Bylaws was not arbitrary and capricious. As a result of that finding, this Court must necessarily also find that the IRB's determination that Giacumbo violated Article II, Section 2(a) and Article XIX, Section 7(b)(1) and (2) of the IBT Constitution is not "arbitrary or capricious."

Giacumbo's arguments to the contrary do not require a different result. To reiterate, Giacumbo's first objection to the IRB's findings regarding the Allways organizing attempt is that it ignored "testimony to the contrary." As noted above, Giacumbo fails to inform this Court of the substance of this testimony, or even where in the transcript this Court might find it. In light of these failures and this Court's extremely limited power to overturn the IRB's factual findings, *Friedman & Hughes,* 905 F.2d at 616, this Court cannot find the IRB's determination to be arbitrary and capricious.

Giacumbo's argument that the he did not recruit the Allways employees for his political benefit because only five of the fifteen Allways employees became Local members is flawed. Simply because he did not obtain the membership of every Allways employee does not negate the IRB's finding that Giacumbo intended to enhance his chances at the polls by obtaining the five Allways members. For the same reason, Giacumbo's assertion that he disallowed the membership of a sixth Allways employee does not render benign his intent with regard to the memberships of the other five employees.

In addition, Giacumbo's contention that permitting the Allways employees to become Local members to help Allways obtain the IBT travel contract was not improper is refuted by the plain language of Article II, Section 2.01(A)(2) and (3) of the Local 843 Bylaws. Pursuant to those provisions, the

objects of the Local are to "unite" workers in order to "provide services" to them through collective bargaining. Giacumbo's attempted influence peddling—even though it was unsuccessful—clearly falls outside the scope of the Local's objectives. That Giacumbo was impotent to actually influence the IBT's travel contract decision does not make his conduct less violative of the Local's Bylaws.

Finally, Giacumbo's attempt to justify his conduct by pointing to the IBT's alleged practice of "awarding business to union employers" misses the mark as well. Teamsters membership is a privilege accorded to *employees* who agree to bargain collectively in order to improve, among other things, their working conditions and their financial security. Giacumbo, however, permitted the Teamsters to be used to benefit an *employer*—Allways—by accepting its employees as Local 843 members in order to secure a contract for Allways.. There is no evidence that Giacumbo or Local 843 did anything to benefit the Allways employees. This Court finds that the IRB was not arbitrary or capricious in determining that Giacumbo misused the privilege of Teamsters membership by undertaking to benefit Allways by organizing its employees. Moreover, this Court finds that Giacumbo's reliance on this argument demonstrates that he continues to misunderstand the nature and purpose of Teamsters membership.

*3. The Appropriateness of the Sanctions*

Giacumbo's final challenge to Application XXV of the IRB is his claim that the sanctions imposed on him are excessive in light of the charges against him. In its 1995 Opinion and Decision, the IRB imposed on Giacumbo the following sanctions: (1) a six-month suspension from membership and from his position in the IBT during which he (2) could draw no salary or compensation from any IBT-affiliated source; (3) a $1,600 fine, payable to the IBT, and (4) which cannot be waived or set off against future salary. (1995 IRB Opinion & Decision at 29.) Giacumbo argues that "the effect of [his] suspension ... from union membership is to disenfranchise him from further participation as an announced candidate for [IBT] office in the upcoming IBT and local union elections." (App. XXV Objections at 26.) In support of his claim that the sanctions imposed by the IRB were inappropriate, Giacumbo asserts that his prosecution "is without ready precedent in the now over six years since the implementation of the Consent Decree." (App. XXV Objections at 24.) Giacumbo argues that no relevant precedent exists because the Consent Decree's goals—eradicating corruption and the influence of organized crime—are inapplicable to the instant case. *Id.*

In addition, Giacumbo offers examples of his honesty, such as his "tireless[ ] efforts to improve the conditions of the Local" and his refusal "to profit from his position." *Id.* at 24–25. Giacumbo contends that "[t]hese facts provide important perspective to the charges against [him] ... [and] effectively inter any finding of fraudulent intent on his part with respect to any of the charges, including, of course, embezzlement." *Id.* at 25. Giacumbo maintains that, rather than fraud or corruption, "[t]he actions that form the basis of the charges in this case ... appear at their worst to stem from ... the failure by the Local's Executive Board, Mr. Giacumbo included, to have run a much tighter ship." *Id.* at 26 (quotation omitted). Giacumbo argues, "[s]uch a well-intentioned failure, if it amounts to such, provides no basis to support the sanctions imposed by the IRB in this case." *Id.*

The Chief Investigator did not respond to Giacumbo's challenges to Application XXV regarding the appropriateness of his sanctions. *See generally* (CI Memo.) The Government, however, argues that the sanctions the IRB imposed on Giacumbo were not arbitrary or capricious. The Government points out that Giacumbo's argument that his sanction are inappropriate "for bylaw violations alone," is yet another "attempt[ ] to minimize the significance of his repeated disregard of the clear rules and regulations of the IBT and the Local." *Id.* Despite Giacumbo's argument to the contrary, the Government contends that "bylaw violations must be taken seriously and are proper subjects of discipline ... particularly ... where, as here, the violation implicates the union's financial con-

trols and results in the diversion of union funds." *Id.* In addition, the Government notes that Giacumbo's objections to his sanctions "ignores the other serious charges against him, including embezzlement ... which alone could support the sanctions against him." *Id.* Finally, the Government contends that Giacumbo's argument that his sanctions are inappropriate because the charges against him do not implicate the purposes of the Consent Decree—ridding the Teamsters of organized crime and corruption—cannot be supported by precedent. *Id.* at 7–8.

In this Court's January 11, 1996 Remand Order, this Court determined that "regardless of the merits of the IRB's charges, the sanctions imposed by the IRB are not commensurate with the severity of the charges levelled against Giacumbo." (Remand Order at 2). Thus, this Court has not considered the merits of Giacumbo's objections regarding the propriety of the sanctions the IRB imposed upon him. This Court will do so now.

This Court finds Giacumbo's assertion that his sanctions are excessive at best specious, and, viewed less charitably, intentionally misleading and disingenuous. To reiterate, Giacumbo asserts that this Court has rendered no decisions in cases, such as his, in which "a union officer or member has been charged and sanctioned for bylaw violations alone in the absence of some further finding of criminal wrongdoing or association." (App. XXV Objections at 24.) Irrespective of Giacumbo's depiction of this Court's numerous Consent Decree opinions, this Court finds that Giacumbo's position that the IRB sanctioned him only for bylaw violations is utterly groundless. The IRB determined that Giacumbo breached not only Local 843's Bylaws, but also the following provisions of the IBT Constitution: (1) Article II, Section 2(a) (Charges One and Two); (2) Article XIX, Section 7(b)(1) and (2) (Charge One); (3) Article XIX, Section 7(b)(1) (Charge Two); (4) Article XIX, Section 7(b)(1)–(3) (Charge Three); and (5) Article XXIII, Section 3 (Charge Two). *See generally* (1995 IRB Opinion & Decision.)

Article II, Section 2(a) of the IBT Constitution states that "[e]ach person upon becoming an [IBT] member thereby pledges his honor: to faithfully observe ... the Bylaws and laws of his Local Union." (IBT Const. Art II, § 2(a).) Similarly, Article XIX, Section 7(b)(1) provides that the basis for charges against a union member includes "[v]iolation of any specific provision of the ... Local Union Bylaws ... or failure to perform any of the duties specified thereunder." *Id.* Art. XIX, § 7(b)(1). By their terms, these provisions of the IBT Constitution are violated whenever a Local Union Bylaw is violated. As a result, Giacumbo's claim that he was charged with only bylaw violations is plausible insofar as his violations of these IBT Constitutional provisions are concerned.

However, for Giacumbo to claim that he was charged only with bylaw violations is startling in the face of the remaining IBT Constitutional provisions. Article XIX, Section 7(b)(2) and (3) of the IBT Constitution in relevant part provide:

> (b) The basis for charges against members, officers, elected Business Agents, Local Unions, joint Councils or other subordinate bodies for which he or it shall stand trial shall consist of, but not be limited to, the following:
>
> * * * * * *
>
> (2) Violation of oath of office or the oath of loyalty to the Local Union and the International Union.
>
> (3) Breaching a fiduciary obligation owed to any labor organization by any act of embezzlement or conversion of union's funds or property.

*Id.* Art. XIX, § 7(b)(1)–(2). Article XXIII, Section 3 of the IBT Constitution states:

> When Local Union Secretary–Treasurers pay bills by check, such checks must bear the signature of any two (2) of the following: the Local Union President, the Local Union Secretary–Treasurer, or one (1) other officer or elected Business Agent. In the event that two (2) or all of these officers become ill or otherwise incapacitated the Local Union Executive Board shall

designate substitutes for the purpose of signing such checks.

*Id.* Art. XXIII, § 3.

As the text of these provisions plainly reveals, their violation does not require a predicate breach of a Local Union's bylaws. Instead, each can be breached independently of a violation of any other IBT Constitutional provision, Local Union Bylaw, or any IBT or Local Union rule or regulation. Nevertheless, the IRB found that Giacumbo's conduct comprised a breach of each one of these IBT Constitutional provisions. As a result, Giacumbo's assertion that the IRB found that he violated only the Local 843 Bylaws is not only factually incorrect, but it also edges dangerously close to an intentional misrepresentation to this Court. This Court reluctantly declines to consider whether to sanction Giacumbo and his attorney for their misleading representations to this Court. This Court finds, however, that the IRB's determination that Giacumbo breached the IBT Constitution—not just the Local Bylaws—completely undermines Giacumbo's argument that there is no precedent supporting Giacumbo's sanctions.

A review of this Court's previous Consent Decree opinions reveals that Giacumbo's sanctions—essentially a six-month suspension and a $1,600 restitution payment—were well below the level of sanctions imposed upon individuals who were found to have committed similar, or even less egregious, conduct. For example, in *Ligurotis,* this Court affirmed the Independent Administrator's determination that Ligurotis, an IBT Local 705 ("Local 705") financial officer, should be *permanently barred* from the IBT for embezzlement, conversion, and "engaging in a pattern of conduct that allowed corruption and unlawful activity to flourish in the Local." 814 F.Supp at 1294. The Independent Administrator found that Ligurotis had on four occasions misappropriated funds for himself. *Id.* at 1294–95. In so doing, Ligurotis twice circumvented the Executive Board's approval which was required to disburse funds, including improperly issuing Local 705 checks. *Id.*

Giacumbo's attempt to distinguish the instant case from *Ligurotis* is unavailing. (App. XXV Objections at 26.) On the contrary, this Court finds that Giacumbo's case has substantially more in common with Ligurotis' than Giacumbo cares to acknowledge. Giacumbo, like Ligurotis, engaged in numerous financial misdeeds—including the unauthorized issuance of checks from their respective Local Unions—which resulted in their own financial gain. Giacumbo wrote several Local 843 checks to himself, purportedly as salary advances, without a required second signature, and knowingly accepted $1,600 car payments to which he was not entitled. Similarly, Ligurotis granted himself salary increases and improperly wrote Local 705 checks which resulted in a substantial unauthorized loan from Local 705 to himself.

In addition to the financial misconduct which Giacumbo shares with Ligurotis, they each engaged in non-financial behavior which violated the IBT Constitution and their respective Locals' Bylaws. Giacumbo contends that Ligurotis' possession of a handgun of the Local's premises, the hiring of convicted felons, and a contempt charge are factors which are not "even remotely present in this case." However, the IRB determined that Giacumbo also improperly solicited the All-ways employees to become Local 843 members in order to gain votes in the November 1992 Local 843 election. While Giacumbo's conduct differs from Ligurotis' in that it does not involve felons or firearms, Giacumbo's vote-packing scheme can be viewed as more invidious because the IRB found that Giacumbo sought to corrupt the Local 843's democratic processes. In light of Ligurotis' permanent ban for similar conduct, therefore, this Court finds that Giacumbo's claim that his six-month suspension and $1,600 fine were excessive is meritless.

Moreover, this Court rejects Giacumbo's contention that the instant case does not implicate "the heartland concerns of the Consent Decree ... [which are] the eradication of corruption and the concomitant threat of [organized crime] influence." *Id.* at 24. While there is no allegation that Giacumbo is linked to organized crime, the Consent Decree is undeniably concerned with the sort of misconduct which the IRB proved Giacumbo

committed. In fact, the Consent Decree itself states that "it is imperative that the IBT ... be maintained democratically, with integrity, and for the sole benefit of its members...." (Consent Decree at 2.) Such goals cannot be achieved until the Teamsters purges from its membership individuals who commit the sort of financial self-dealing and election fraud which Giacumbo has perpetrated. Accordingly, this Court finds that Giacumbo's argument that his conduct does not fall within the purview of the Consent Decree is unpersuasive.

Finally, Giacumbo's repeated offers of examples of his honesty are irrelevant. Whether he declined a specific salary increase or use of a union automobile simply does not address the specific conduct at issue in the three charges against him. Accordingly, episodes of selfless behavior—even if true—do not mitigate the harshness of the sanctions which Giacumbo's misconduct warrants.

As a result of the foregoing, this Court finds that the Application XXV's factual findings should be affirmed in all respects. Because this Court previously remanded Application XXV's sanctions, however, this Court passes no judgment on their merits. Instead, because the IRB submitted its modified sanctions of Giacumbo as Application XXX, this Court will consider the merits of those sanctions below. Accordingly, it is Application XXX to which this Court must turn its attention.

### B. *Giacumbo's Application XXX Objections*

Giacumbo objects to Application XXX on the following grounds: (1) "the adequacy of the finding underlying this Court's decision to remand" Application XXV for reconsideration, (App. XXX Objections at 2); (2) the IRB's decision was arbitrary and capricious because it ignored and mischaracterized testimony adduced at the supplemental hearing, *id.* at 2–4 & 3 n. 1.; (3) Giacumbo's "presence at the Local 843 delegate election in no way contravened the terms of any of the sanctions imposed by the IRB," *id.* at 4; and (4) the appropriateness of the sanctions the IRB imposed on Giacumbo after this Court's remand, *id.* This Court will consider each of Giacumbo's challenges individually.

#### 1. *Remand Procedure*

Giacumbo's first challenge to Application XXX is his claim that "a serious question exists regarding the adequacy of the finding underlying this Court's decision to remand this matter for reconsideration." *Id.* at 2. He asserts that this Court may set aside an IRB decision only where it is "arbitrary and capricious or otherwise contrary to law." *Id.* Giacumbo argues that this Court's failure to make a specific finding in its Remand Order that the IRB's sanctions were arbitrary and capricious renders the remand improper. *Id.*

In opposition to this argument, the Chief Investigator asserts that this Court's remand complied with applicable law. (Carberry Letter at 2.) The Chief Investigator contends that Giacumbo misconstrues the case law, and that this Court has no obligation to provide a detailed explanation for its remand decision. *Id.* Instead, under the law of the Consent Decree, this Court may "set [a] penalty aside when it thinks the administrator arbitrarily fixed it either too high or too low, and remand the matter to the administrator with instructions to assess the penalty anew." *Id.* at 2–3 (quotation omitted). Indeed, the Chief Investigator asserts that in the instant case, "this Court went beyond th[e] instruction ["to assess the penalty anew"] and observed ... that the IRB's original imposition of sanctions was 'not commensurate with the severity of the charges levelled against Giacumbo.'" *Id.* at 3 (quoting Remand Order). The Chief Investigator maintains that, as a result, this Court's remand "provided sufficient instruction under controlling law for the IRB to reconsider the sanction." *Id.*

The Government opposes on two grounds Giacumbo's claim that this Court made insufficient findings to support its remand due to inappropriate sanctions. (Gov't App. XXX Letter at 1.) First, the Government argues that Giacumbo "may not now be heard to object to the procedure on remand in light of the fact that he failed to raise any such objection before the IRB [at his supplemental hearing] ... [but instead] used the re-

mand as an opportunity to supplement the record ... regarding the appropriateness of further sanctions." *Id.* Second, the Government maintains that "there is ample authority under the Administrative Procedure Act for a court, without considering the merits, to remand to an agency where the agency's decision was inconsistent or did not fully and clearly set forth the basis for its determination." *Id.* at 2.

This Court derives its authority in this case from the terms of the Consent Decree, which incorporates the Administrative Procedure Act's standards of review applicable to final agency action. *Wilson, Weber & Dickens,* 978 F.2d at 73. Accordingly, this Court may set aside a final determination of the IRB only where it is "arbitrary or capricious or otherwise contrary to law." *Id.* (citing 5 U.S.C. § 706(2)(A)). Under the APA—and thus under the Consent Decree—this Court "may only consider whether the administrator made 'an allowable judgment in [his or her] choice of remedy.'" *Id.;* (citing *Sokoloff v. Saxbe,* 501 F.2d 571, 576 (2d Cir.1974) (quoting *Butz v. Glover Livestock Comm'n Co.,* 411 U.S. 182, 189, 93 S.Ct. 1455, 1457, 36 L.Ed.2d 142 (1973))). This "allowable judgment" standard of review is equivalent to the arbitrary and capricious standard. *Id.; see also Willy's Grocery v. United States,* 656 F.2d 24, 26 (2d Cir.1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1011, 71 L.Ed.2d 301 (1982).

With regard to sanctions, the Second Circuit clearly has set forth the procedure to be utilized by district courts in considering the appropriateness of an agency's imposition of sanctions. *Id.* at 74. The reviewing court must first determine that the agency's choice of sanctions was arbitrary and capricious, because, "[a]bsent such a finding, it is questionable whether the trial court ha[s] the authority to set aside the penalty imposed by the [IRB]." *Id.* Such a procedure "improperly substitute[s] [the court's] judgment for that of the [IRB]." *Id.* Such deference to the IRB's judgments with respect to sanctions is warranted because "[t]he officers [who] preside over the disciplinary hearings pursuant to the Consent Decree are 'best situated to determine and fix the penalty to be imposed on IBT members'" who appear before them. *Simpson,* 931 F.Supp. at 1113 (quoting *Cimino,* 964 F.2d at 1311. As a result of this deference, the Second Circuit has instructed courts reviewing the sanctions imposed by the IRB that "[t]he better practice in such a case ... is for the district court to set the penalty aside when it thinks the administrator arbitrarily fixed it either too high or too low, and remand the matter to the administrator with instructions to assess the penalties anew." *Wilson, Weber & Dickens,* 978 F.2d at 73.

In the instant case, this Court's remand of Application XXV conformed to this procedure. Although this Court did not articulate the code words "arbitrary and capricious" in its determination that Giacumbo's sanctions were woefully inadequate, this Court unmistakably conveyed that finding in the text of the Remand Order. In its Remand order, this Court recounted the charges against Giacumbo, and observed that "the IRB found that all three charges against Giacumbo have been proved...." (Remand Order at 1.) This Court found, however, that

> the fines imposed by the IRB are not punitive and are designed merely as restitution for the funds that Giacumbo allegedly embezzled; and
>
> * * * * * *
>
> ... regardless of the merit of the IRB's charges, the sanctions imposed by the IRB are not commensurate with the severity of the charges levelled against Giacumbo;

*Id.* at 2. Accordingly, this Court remanded Application XXV to the IRB, stating that

> the IRB should reconsider the sanctions it seeks to impose on Giacumbo in light of the fact that the IRB has found that Giacumbo has brought reproach upon the IBT by facilitating union membership for improper purposes, breaching his fiduciary duties, violating Local 843 financial control provisions, and embezzling IBT funds[.]

*Id.* In rendering this ruling, this Court noted that it "ma[de] no finding regarding the merits of either the [1995] IRB Opinion and Decision or Giacumbo's Objections." *Id.*

This Court finds that, because Giacumbo's original sanctions were so mild in relation to the gravity of the charges levelled against him, that, without articulating the precise words "arbitrary and capricious," this Court's Remand Order did, in fact, predicate its remand upon a finding that Giacumbo's sanctions were arbitrary and capricious. Thus, this Court's remand to the IRB for reconsideration of the sanctions was entirely proper pursuant to the procedures set forth by the Second Circuit in *Wilson, Weber & Dickens*. Accordingly, this Court finds that Giacumbo's first objection to Application XXX is without merit.

*2. Supplemental Hearing Testimony*

In his second objection to Application XXX, Giacumbo contends that, even if this Court's Remand Order was proper, the IRB ignored much of the testimony adduced at the supplemental hearing and mischaracterized other portions of the supplemental hearing testimony. This Court will consider each of these claims separately.

*a. Giacumbo's Claim that the IRB Ignored Testimony*

Giacumbo claims that "the testimony adduced at the [supplemental] hearing uniformly supported the testimony presented at the original hearing that Mr. Giacumbo throughout his career as a union officer aggressively ... avoided any hint of self-dealing." (App. XXX Objections at 2.) For example, Giacumbo offers the testimony of "Deborah Kuffer, who alternately has been a political ally and opponent of Mr. Giacumbo ... [and] stated unequivocally that "[t]here is no doubt in my mind about Gene's integrity. I'm sure he hasn't put a dime in his pocket or profited in any way himself from the [L]ocal." *Id.* Giacumbo also asserts that Kuffer's testimony was supported by each of the four other witnesses called at the supplemental hearing, two of whom .. have known Mr. Giacumbo for much of his adult life, and all of whom endorsed his character without question." *Id.*

The Chief Investigator's submission regarding Application XXX does not directly address Giacumbo's argument that the IRB ignored parts of the supplemental hearing testimony. *See generally* (Carberry Letter.) The Chief Investigator does, however, point out that "the IRB found that the testimony of the character witnesses Giacumbo called at the supplemental hearing w[as] not on point and w[as] unpersuasive," and that the character evidence itself reflected Giacumbo's "arrogance in the exercise of his power as a Union official." *Id.* at 4.

The Government opposes Giacumbo's arguments that the IRB ignored supplemental hearing testimony. (Gov't App. XXX Letter at 2.) The Government argues that

> Giacumbo presented no new evidence to cast doubt on the IRB's findings that he (1) embezzled from the union by accepting overlapping benefits, (2) repeatedly violated the financial controls in the local's bylaws and the IBT Constitution, and (3) brought reproach upon the union by bringing individuals into the union not for the purpose of representing them in collective bargaining but in order to obtain additional votes for the election and to obtain a contract for their employer from the IBT.

*Id.* Like the Chief Investigator, the Government argues that the IRB properly found that Giacumbo's character witnesses' testimony "did not support mitigating the sanction to be imposed, but rather favored the imposition of a three-year suspension." *Id.*

To reiterate, this Court reviews the findings of the IRB with "great deference." *Friedman & Hughes,* 905 F.2d at 616. Only the findings which this Court determines to be arbitrary and capricious may be overturned. *Wilson, Weber & Dickens,* 978 F.2d at 71. Moreover, because the IRB can observe witnesses' demeanor, its judgments with regard to witness credibility are entitled to substantial deference from this Court on review. *Simpson,* 931 F.Supp. at 1113; *Cimino,* 964 F.2d at 1311.

Pursuant to this standard, this Court finds that the IRB did not arbitrarily or capriciously ignore supplemental hearing testimony. At the supplemental hearing, Giacumbo presented the testimony of four witnesses: Kane, Theodus, Krohmert and Ferguson. (1996 IRB Opinion & Decision at 2.) The

IRB found that "[n]one of these witnesses had any knowledge of Giacumbo's specific practice and dealings [with Local 843], particularly as they related to the IRB's findings for its [1995] Opinion and Decision." The IRB found that Kane offered only "generally conclusory testimony" affirming Giacumbo's honesty, courage and intelligence. *Id.* Similarly, the IRB determined that, because Theodus' opinion of Giacumbo's honesty was "based solely upon his perception of Giacumbo's belief in the IBT and Giacumbo's role as a political crusader," his testimony was entitled to little weight. *Id.* In addition, the IRB discounted the value of Krohmert's testimony because his opinion of Giacumbo's honesty was based solely on the assistance Giacumbo had given Krohmert in obtaining work after an illness. *Id.* Finally, the IRB found that Ferguson's testimony had no foundation in Giacumbo's union-related conduct, but in his longtime personal friendship with Giacumbo. *Id.*

Giacumbo does not dispute IRB's finding that none of these witnesses offered testimony regarding the specific conduct underlying the charges against Giacumbo. Instead, his only objection is that the IRB ignored his witnesses' testimony. This objection is easily disposed of. First, as just discussed, the IRB individually considered and rejected the testimony of every one of Giacumbo's witnesses. The IRB's decision to do so was grounded in its finding that these witnesses offered only "conclusory allegations" and provided no testimony relating to the conduct with which he is charged by the IRB. In light of the substantial deference this Court is required to give findings of the IRB, this Court cannot determine that the IRB's decision to discount Giacumbo's character witnesses was arbitrary or capricious.

*b. Giacumbo's Claim that the IRB Mischaracterized Testimony*

In addition to his assertion that the IRB ignored supplemental hearing testimony, Giacumbo complains that "[t]he IRB mischaracterize[d] Mr. Theodus' testimony by suggesting that Theodus believes it is appropriate for local officers to violate their own bylaws." *Id.* at 3 n. 1. Giacumbo contends that Theodus actually testified that "the IBT's recent history of arbitrarily enforcing compliance with Locals' bylaws ... [had] created confusion as to what practices are permitted." *Id.* In addition, Giacumbo claims that Theodus further testified that the Secretary–Treasurer's Manual serves as a guideline for conducting union finances and that "there are different occasions when you may vary from what the manual exactly says." *Id.* On those occasions, Theodus testified that the "bottom-line" question is intent, and that Giacumbo would never attempt to cheat or defraud. *Id.*

Neither the Chief Investigator nor the Government responded to Giacumbo's argument that the IRB mischaracterized Theodus' testimony at the supplemental hearing. In fact, in their submissions in support of Application XXX, both the Chief Investigator and the Government rely on the IRB's findings regarding the testimony which Giacumbo claims was mischaracterized. *See* (Carberry Letter at 4); (Gov't App. XXX Letter at 2.)

The excerpt of the 1996 IRB Opinion and Decision which Giacumbo claims mischaracterizes Theodus' testimony reads:

> [C]onclusory testimony concerning Giacumbo's "personal character by way of mitigation" does not cause us to conclude that any sanctions to be imposed should be lessened "commensurate with the severity of the charges proven ..."
>
> Instead, the character evidence itself supported the findings of our [1995] Opinion & Decision reflecting Giacumbo's arrogance in the exercise of his power as a Union official. *Theodus confirmed that he believed that Giacumbo sees himself as above the rules. According to Theodus, Giacumbo believed there were situations when it was appropriate for local officers to violate the bylaws of the own locals.*

(1996 IRB Opinion & Decision at 3 (footnotes omitted) (emphasis added).)

This Court finds that Giacumbo is correct in asserting that the IRB mischaracterizes the above-quoted excerpt from Theodus' testimony. The supplemental hearing testimony which Giacumbo alleges the IRB misconstrued is that elicited by the Chief In-

vestigator during his cross-examination of Theodus. *Id.* To prevent confusion, this Court will quote Theodus' cross-examination in full:

Q. Mr. Theodus, as a local officer accounting for the members' money is one of your most important duties; isn't that correct?

A. Yes, it is.

Q. As a local officer you have an obligation to comply with the bylaws which are there to protect the members; is that correct?

A. Well, we are supposed to, but there have been some recent things take place at the international union where local bylaws are not what they are supposed to be.

Q. But you believe that you have an obligation to comply with the bylaws?

A. I believe that, yes.

Q. And you have an obligation to believe that you are to comply with the financial controls to protect the members' money that are found in the bylaws and the Secretary/Treasurer's Manual; is that right?

A. Yes.

Q. Now you indicated that Mr. Giacumbo is a man of very strong opinions, in that despite your own guidance or advice on matters he still would do what he believes is right?

A. Yes.

Q. And do you believe that Mr. Giacumbo, if he thought he was right, would act contrary to requirements in the bylaws, or the Secretary/Treasurer's Manual?

A. Well, I'm going to put it this way. I used to have a basic knowledge and a feeling of what was right and what was wrong, what your bylaws dictate and what past practice dictated.

However, since the IRB got involved since the Carey administration, all of that has been changed. You can no longer rely on what you did in the past. You must now, by some edict, when you get reelected each three-year term you must now bring up all these things that have been going on in the past and now make it legal, so to speak.

So there has been a major change in this international union about what's right and what's wrong. So when officials now handle certain financial things, they may not always be right. They may be right by what they did by following their local bylaws and by past practices that are now no longer right. So they are in a quandary, because there has been no new edition of the Secretary Treasurer's/ Manual [sic] out, there has been very little communications to local officials about this being wrong, that being wrong. There has not been a notice put out to local officials that say you paid your full-time officers a stipend, if you will, for attending their Executive Board meetings. That is no longer permissible. That wasn't put out until after the fact.

Q. Let me give you an example.

You don't dispute, do you, that it would be wrong for a local officer to sign local checks to himself as the sole signatory?

A. It depends on the circumstances.

Q. You don't, that's not a violation of your bylaws?

A. Yes, it would be.

Q. But you believe in certain circumstances you, as a local officer, have a right to violate an expressed bylaw provision?

A. Again—

Q. Answer yes or no. Do you believe that you, as a local officer, have the right to violate an expressed bylaw provision?

A. Well, after what's happened in this union, I would have to say yes, because the international has allowed locals to violate their bylaws, knowingly violate their bylaws. So are bylaws in local unions sacrosanct? Are they the law?

Q. Your position is that you now, as president of your local, have the right to violate expressed provisions in your bylaws?

A. I believe so, at the direction of the international president.

MR. LACEY: Let's forget for the moment whether there is any direction. Let's put yourself in the situation where you have your bylaws before you. Your statement is that you have the right to violate those?

THE WITNESS: I used to believe that we didn't have the right.

MR. LACEY: But now you believe you have the right to violate?

THE WITNESS: Because the international has allowed locals to violate them.

Q. Do you swear, when you're elected that you will follow your bylaws?

A. Yes.

Q. But you believe that that is not binding on you?

A. Well, because the international, who is supposed to direct all of us, have the authority over us, in my opinion has allowed individuals to violate their bylaws.

Q. So you believe you have a right now to violate our sworn obligation to—

A. I'm not sure anymore. There used to be some rules that were here and they were steadfast over the 44 years that I've been around. Now it's all changing. However, directions coming from the international, they are sure changing also.

Q. Do you believe you have a right to take the local's money and spend it on a personal purchase?

A. No.

Q. Now you've had no dealings on a local level with Mr. Giacumbo's local; is that correct?

A. No.

Q. And you have no personal knowledge of the facts in this case, do you?

A. Oh, sure.

Q. Well, you've learned them from other sources. You weren't there at the local?

A. No, I wasn't, no.

Q. I have no further questions.

(Supplemental Hearing Tr. 415–21.)

Even in light of the substantial deference this Court must give to the IRB's factual findings, *see Friedman & Hughes,* 905 F.2d at 616, this Court finds that the IRB's determination that "Theodus confirmed that he believed that Giacumbo sees himself as above the rules" to be arbitrary and capricious. In reviewing the entire transcript of Theodus' testimony, this Court can locate no statement by Theodus which can be construed to say that Giacumbo believed he was above the law. True, the Chief Investigator asked Theodus whether Giacumbo felt that way, but Theodus' answer is, at best, ambiguous. In the absence of a statement by Theodus which can be even broadly interpreted to state this, this Court finds that there is no evidence to support the IRB's characterization of the testimony. Accordingly, this Court finds the IRB's representation of Theodus' testimony is arbitrary and capricious.

### 3. *Union Democracy*

Giacumbo's next objection to Application XXX is that his outspoken involvement in union politics renders the IRB's sanctions against him arbitrary and capricious. In support of this assertion, Giacumbo offers supplemental hearing testimony which "underscore[s] [his] staunch commitment to fostering a 'democratic participation is the affairs of the union,' which presumably remains the core goal of the Consent Decree." (App. XXX Objections at 3 (quotation omitted).) Giacumbo looks to Theodus' testimony which "graphically described the treatment, including verbal harassment and physical threats, accorded to Mr. Giacumbo by other members of the IBT General Executive Board when Mr. Giacumbo sought to question the union's finances or General President Carey's actions." *Id.* As a result, Giacumbo asserts that his political activism should dissuade this Court from affirming the IRB's findings because the "ultimate effect of the IRB's decision is to silence one of the leading voices of opposition to the Carey administration...." *Id.* at 4.

Neither the Chief Investigator nor the Government responded to Giacumbo's argument that his political activity should militate against the severity of his sanctions. *See generally* (Carberry Letter); (Government Letter.) The IRB, however, found that

> [t]he circumstance that Giacumbo may be a political crusader who has the courage to stand up against what he perceived as political interests within the IBT ... does not place him or any other IBT member above the rules. The purpose of the political process, among other things, is to de-

> termine who will make and administer the rules for representing members. The fact that a person may be politically courageous does not exempt him from operation of the rules that he is charged to obey, administer or enforce. Nor does the fact that some participants in the electoral processes of the Union believe that they are right and the opposition is wrong license departure from the rules to achieve an objective.

(1996 IRB Opinion & Decision at 6.)

This Court finds Giacumbo's argument unpersuasive. Like the IRB, this Court finds that political activism, while admirable, cannot excuse misconduct. Union politicians, like government politicians, are entrusted with the absolute responsibility to faithfully serve those who are powerless to represent themselves. Thus, union members who are actively engaged in IBT politics should be strictly held to this obligation, not excused from it. Accordingly, Giacumbo's argument based on his political activism does not render the IRB's sanctions arbitrary or capricious.

### *4. Giacumbo's Violations of the IRB's Initial Sanctions*

Giacumbo's fourth objection to Application XXX concerns the IRB's determination that Giacumbo's efforts to "maintain his status as a delegate nominee" for Local 843 office violated his initial six-month suspension from holding any position in any IBT-affiliated entity. (App. XXX Objections at 4.) At the supplemental hearing, Krohmert testified that he invited Giacumbo to the Local's nomination meeting to distribute literature for the Hoffa campaign and that Krohmert "subsequently nominated Mr. Giacumbo for delegate." *Id.* Giacumbo explains that "no effort was made to conceal [his] identity or the fact of his suspension." *Id.* "Importantly," Giacumbo asserts, "neither the Elections Officer for trustee [of Local 843], both of whom were well aware of Mr. Giacumbo's status, made any attempt to bar him from the meeting or otherwise disallow his nomination, which they apparently viewed as a protest vote." *Id.* Nevertheless, the Election Appeals Master "ultimately ruled that Mr. Giacumbo was ineligible to run because of his suspension in this case." *Id.* Giacumbo claims that his "presence at the [February 2, 1996,] Local 843 delegate election in no way contravened the terms of any of the sanctions imposed by the [1995 IRB Opinion & Decision]." *Id.*

The Chief Investigator argues that Giacumbo's participation in the Local election did, in fact, breach his previously imposed sanctions. (Carberry Letter at 4.) The Chief Investigator points out that "[t]he Local 843 delegate elections was exclusively a membership activity ... [and that] Giacumbo not only attended this meeting, but he also participated in [it] ... [by] allow[ing] himself to be nominated and support[ing] the nomination of others." *Id.* Because such activities "were exclusively reserved for members in good standing," the Chief Investigator maintains that Giacumbo violated his suspension from union membership. *Id.*

The Government responds only briefly to Giacumbo's objection on this point. (Gov't App. XXX Letter at 2–3.) The Government argues that Giacumbo's violations of the terms of his sanctions "did not support mitigating the sanction to be imposed, but rather favored the imposition of a three year suspension." *Id.* at 2.

In its 1996 Opinion and Decision, the IRB found that while suspended from IBT membership, Giacumbo attended a Local 843 nomination meeting for delegates to the 1996 IBT International Convention. (1996 IRB Opinion & Decision at 4.) The IRB determined that, at that meeting, "Giacumbo was nominated by Krohmert as a delegate and, in turn, [Giacumbo] supported other members' nominations to serve as delegates." *Id.* The IRB found that, according to Article III, Section 5(c) of the IBT Constitution, "to be eligible to serve as a delegate, Giacumbo had to be in 'good standing' for twenty-four months prior to his nomination." *Id.* at 4 & 4 n. 8. The Election Appeals Master ruled that Giacumbo was ineligible to be nominated for the position of delegate because of the suspension imposed upon him by the 1995 IRB Opinion and Decision. *Id.* at 4.

As a result of these factual findings, the IRB determined that "[t]here is no question that Giacumbo knew of, and acquiesced in,

his name being placed in nomination and that he assisted in efforts to maintain his status as a delegate nominee despite the fact that, due to his suspension from membership, he was clearly ineligible." *Id.* 4–5. Accordingly, the IRB determined that "Giacumbo ... willfully disregarded our initial sanction of a six-month suspension, [which is] conduct highly probable of Giacumbo's character, which he put in issue." *Id.* at 5. The IRB also disposed of Giacumbo's argument—raised only before the Appeals Master, not before the IRB or this Court—that his six-month suspension was "somehow rendered ineffective" by this Court's Remand Order. *Id.* at 5 n. 11. The IRB found that Giacumbo waived this claim by failing to make this argument at his supplemental hearing or in his post-hearing submissions. *Id.*

This Court finds that the IRB's determination that Giacumbo's participation in the 1996 Local 843 delegate nomination meeting violated his initial sanctions is not arbitrary and capricious. The terms of the sanctions the IRB imposed on Giacumbo in the 1995 IRB Opinion and Decision in relevant part read: "Giacumbo [is] suspended from membership and from his position in the IBT for a period of six months[.]" (1995 IRB Opinion & Decision at 29.) The IRB specifically found that Giacumbo participated in the affairs of Local 843 by being nominated, and supporting others' nominations, for the position of delegate to the IBT Convention. The IRB also determined that only members in "good standing" for the two years preceding their nominations may be nominated. *Id.* According to these findings, the IRB determined that Giacumbo engaged in activities reserved solely for IBT members during the period of his suspension, in direct contravention of his sanctions imposed by the IRB. This Court thus does not find the IRB's determination to be arbitrary or capricious.

Giacumbo's claim to the contrary is wholly unpersuasive. Giacumbo offers no argument to support his position that his attending and participating in the Local's nomination meeting did not violate his sanctions. Instead, he baldly asserts that his conduct did not constitute a breach, and that the failure of the Election Officer and the Local trustee to bar him from the meeting is proof of that fact. It is not the business of anyone but Giacumbo to assure that he abides by the sanctions the IRB imposed on him. His claim that others' failure to recognize and prevent his breach is symbolic of Giacumbo's refusal to take responsibility for his own actions which constitute the basis of the charges against him. Moreover, Giacumbo's unsupported assertion that his conduct did not violate his initial sanctions is belied by the plain language of the 1995 IRB Opinion and Decision.

*5. The Appropriateness of the Sanctions*

Finally, Giacumbo argues that, "in implied recognition of the singular facts of this case, the IRB made no attempt to justify its decision to enhance the sanctions originally imposed by reference to other [IRB] decisions." (App. XXX Objections at 4.) Giacumbo contends that "[a] review of the sanctions previously imposed or approved by the IRB and Independent Administrator reveals that the range of sanctions for charges of embezzlement runs from no suspension, where there was a signed agreement with reimbursement, to permanent bars [from IBT membership]." *Id.* at 4 n. 2. However, Giacumbo maintains that, "[c]harges classified as financial misconduct, which most closely resembles [sic] the charges in this case, have included suspensions for as little as four weeks where the matter was contested or no suspensions where there were signed agreements." *Id.*

Neither the Chief Investigator nor the Government responds specifically to this argument. Rather, they each assert that the IRB appropriately increased Giacumbo's sanctions from six months to three years. *See* (Carberry Letter at 1); (Gov't Letter at 2–3.)

To reiterate, the IRB is vested with broad discretion to set appropriate sanctions. *Simpson,* 931 F.Supp at 1113. The IRB, as the court-appointed officers who preside over the disciplinary hearings pursuant to the Consent Decree, are "best situated to determine and fix the penalty to be imposed on IBT members" who appear before it. *Cimino,* 964 F.2d at 1311–13. The IRB is also "best equipped to evaluate the demeanor,

credibility, and, ultimately, the culpability of those who appear before [it]." *United States v. International Bhd. of Teamsters [DiGirlamo]*, 824 F.Supp. 410, 418 (S.D.N.Y.1993). As a result, this Court cannot disturb the IRB's sanctions unless it finds them not an "allowable judgment," and thus, arbitrary and capricious. *See Wilson, Weber & Dickens*, 978 F.2d at 73.

This Court finds Giacumbo's argument that his three-year suspension from the IBT is excessive in light of the charges against him to be completely lacking in merit. Indeed, this Court finds that the sanctions imposed upon Giacumbo are so lenient as to be arbitrary and capricious. Consequently, this Court finds it appropriate, as it did with Application XXV, to remand Application XXX to the IRB so that the IRB can again reconsider the proper level of sanctions to be imposed on Giacumbo and "assess the penalt[ies] anew." *Wilson, Weber & Dickens*, 978 F.2d at 74. Before doing so, however, this Court will consider Giacumbo's plea for lenient sanctions.

Giacumbo asserts, as he did previously in his objections to Application XXV, that individuals found by the IRB to have engaged in "financial misconduct" have been treated leniently by the IRB. (App. XXX Objections at 2–4.) Giacumbo, however, fails to cite a single case to this Court in support of this position. In order to correct Giacumbo's mistaken view of the case law governing the Consent Decree, this Court will review several of its decisions in cases factually similar to the case at bar.

First, as this Court already discussed in the context of Giacumbo's objections to Application XXV, this Court in *Ligurotis* affirmed the Independent Administrator's decision permanently to bar Ligurotis, a Local Union financial officer, from the IBT for embezzlement, hiring convicted felons, and possessing a handgun on the Local's premises. 814 F.Supp. at 1294. In the instant case, this Court previously found Giacumbo's misconduct comparable to Ligurotis' because, in addition to Giacumbo's embezzlement, unauthorized check-writing, and other financial misconduct which enriched him, Giacumbo also corrupted the Local's democratic election processes by soliciting new members in order to gain their votes. Because the misconduct engaged in by Ligurotis and Giacumbo is so similar, yet their respective sanctions are so uneven, this Court finds that *Ligurotis* supports this Court's finding that Giacumbo's three-year suspension from the IBT is not an allowable judgment, and thus is arbitrary and capricious.

In addition, in *United States v. International Bhd. of Teamsters, [Caldwell]*, 831 F.Supp. 278 (S.D.N.Y.1993), this Court affirmed the Independent Administrator's finding that five Executive Board members (the "members") of Local Union 945 ("Local 945") had embezzled and unlawfully converted Local 945's funds. *Id.* at 282, 287. The Independent Administrator determined that the members had improperly approved the reimbursement of legal fees for two other Local 945 members who had refused to answer the Independent Administrator's questions regarding their own association with organized crime. *Id.* at 280.

As a result of these findings, this Court affirmed the sanctions which the Independent Administrator imposed upon the members. The members were removed from all of their IBT-affiliated officer positions. *Id.* at 281, 287. In addition, all five members were permanently barred from holding such positions in the future and from "obtaining future employment, consulting or other work with the IBT, or any IBT-affiliated entity." *Id.* at 281. The Independent Administrator did, however, permit the members to "retain their IBT membership ... so that they [could] secure employment as rank-and-file members with non-IBT-affiliated entities that have collective bargaining agreements with the IBT." *Id.* In addition, the Independent Administrator prohibited the IBT or any IBT-affiliated entity from contributing funds to any employee benefits available to the members "by virtue of their serving, or having served, as officers of the IBT or any IBT-affiliate." *Id.* at 281–82. Finally, the Independent Administrator ordered that the IBT and IBT-affiliated entities not pay any legal expenses which the members incurred in connection with that disciplinary action. *Id.* at 282.

This Court notes that, despite the seemingly less reprehensible misconduct by the members in *Caldwell,* their sanctions were far more lasting and severe than those which the IRB imposed upon Giacumbo in the instant case. In *Caldwell,* the Executive Board members were disciplined for just one instance of misappropriating Local 945's funds. Moreover, the Independent Administrator made no finding that the misappropriation was for the members' own enrichment. Giacumbo, on the other hand, engaged in a series of unauthorized expenditures of Local 843's funds which, in several instances, financially benefitted himself. In addition, Giacumbo committed non-financial misconduct by attempting to undermine the Local's election processes. In light of the sanctions imposed in *Caldwell* and those imposed upon Giacumbo, this Court finds that *Caldwell* supports this Court's finding that the IRB's sanctions are arbitrary and capricious.

Yet another example of a case in which financial misconduct alone was punished more harshly than Giacumbo's misconduct in the instant case is *United States v. International Bhd. of Teamsters [Morris & McNeil],* 777 F.Supp. 1123 (S.D.N.Y.1991). In that case, this Court affirmed the Independent Administrator's determination that two officers (the "officers") of IBT Local 707 ("Local 707") fraudulently appropriated and converted for their own use over $60,000 of Local 707's funds. *Id.* at 1124–25. The Independent Administrator found that the officers used a "variety of devices" to commit their scheme to defraud Local 707, including backdated petitions to amend Bylaws and falsified minutes. *Id.* at 1126. This Court also upheld the sanctions which the Independent Administrator imposed upon the officers. *Id.* at 1127. Each officer received two concurrent five-year suspensions from the IBT, and was prohibited, *inter alia,* from having any portion of his legal fees paid by Local 707 and from receiving "retirement gifts," such as automobiles. *Id.* at 1125.

The financial misconduct which the officers in *Morris & McNeil* were found to have committed appears comparable to Giacumbo's pattern of financial misdeeds. Moreover, as with *Caldwell,* there is a non-financial element to Giacumbo's misconduct which is not present in *Morris & McNeil*—Giacumbo's attempted election fraud. Accordingly, this Court finds that the concurrent five-year suspensions imposed in *Morris & McNeil*—for arguably less reprehensible conduct than Giacumbo's—undercuts the appropriateness of Giacumbo's three-year suspension. *Morris & McNeil* thus supports this Court's finding that the IRB's choice of sanctions for Giacumbo was arbitrary and capricious.

Finally, just one month ago, this Court approved an Affidavit and Agreement between the IRB and Angela Perrucci ("Perrucci") which imposed upon Perrucci severe sanctions even though she held no elected position in IBT Local 177 ("Local 177"). (Affidavit and Agreement), *United States v. International Bhd. of Teamsters,* 88 Civ. 4486 (Dec. 11, 1996). From June 1994 to May 1995, Perrucci was employed as an office manager at Local 177, and handled Local 177's Pension and Death Benefits Funds. *Id.* at 1. Perrucci was charged by the IRB with embezzling approximately $10,000 from Local 177 by: (1) misusing Local 177's gasoline credit card; and (2) issuing unauthorized checks to herself from the Local 177 General Fund, the Local 177 Pension Fund, and the Local 177 Death Fund. *Id.* Prior to signing the Affidavit and Agreement, Perrucci repaid Local 177 the full amount of her embezzlement. *Id.* at 2–3.

In her Affidavit and Agreement, Perrucci agreed to the following sanctions: (1) resignation of her membership in Local 177; (2) resignation from all positions, elected or appointed, in 177; (2) resignation from all positions, elected or appointed, in Local 177 or any other IBT-affiliated entities; (3) a permanent bar from any position or office, elected or appointed, in the IBT and all IBT-affiliated entities, including Local 177; (4) permanent ineligibility to receive any salary, severance payment, allowance, fee or compensation of any kind from Local 177 or any other IBT-affiliated entities; (5) ineligibility, for a period of ten years, to apply for membership or to become a member in Local 177 or any other IBT-affiliated entity; (6) her permanent refusal to accept any contributions on her behalf to any IBT or IBT affili-

ated entity's fund and her refusal to receive any benefits, gratuities, severance payments or gifts from Local 177 or any other IBT-affiliated entity, except that after her ten-year suspension expires she may receive any benefits provided to union members pursuant to a collective bargaining agreement with her employer; and (7) ineligibility, for ten years, to participate in any of Local 177's activities in any manner. *Id.* at 3–5.

This Court notes that Perrucci's sanctions were imposed after this Court remanded to the IRB an earlier affidavit and agreement between the IRB and Perrucci for insufficient penalties without passing upon the merits of the charges against her. (Order, *United States v. International Bhd. of Teamsters,* 88 Civ. 4486 (May 24, 1996).) Perrucci previously had agreed to a six-year suspension. *Id.* at 3. In Perrucci's Remand Order, this Court instructed the IRB on remand to "consider whether Perrucci should ever be permitted to hold any position within the IBT or any IBT Local." *Id.* It is for that reason that this Court Approved Perrucci's Affidavit and Agreement after the remand—Perrucci's new sanctions barred her from Teamsters membership for *ten years,* and from holding any position of authority in the Teamsters *forever.*

Perrucci's penalties are significantly more punitive than Giacumbo's, even though, unlike Giacumbo, she was only an unelected office worker charged only with financial wrongdoing. Pursuant to the sanctions which the IRB imposed upon Giacumbo upon remand, Giacumbo eventually will become eligible not only for reinstatement as a member of both the IBT and Local 843, but also to once again hold powerful positions within the IBT and its Local Unions. As the IRB found, however, Giacumbo has consistently, brazenly and unapologetically misused his power within the Teamsters. Moreover, as this Court has observed throughout the instant Opinion, Giacumbo fails to accept any responsibility for his own actions, and, even more troubling, repeatedly seeks to justify and minimize the severity of his misconduct. As a result, this Court questions Giacumbo's fitness to ever again hold a position of trust, influence, or authority within the IBT, its Local Unions, or any other IBT-affiliated entity. This Court thus finds that Giacumbo's sanctions are arbitrary and capricious, and remands the instant matter to the IRB for further consideration.

On remand, this Court deems it proper for the IRB to contemplate the wisdom of ever permitting Giacumbo to hold a position of influence within the IBT or any IBT-affiliated entity, given his documented history of misconduct and his startling arrogance of power. This Court further suggests that the IRB revisit its decision to suspend Giacumbo from union membership for so brief a period.

Before concluding, this Court pauses to note that one of the principal vices that the Consent Decree was designed to eradicate is the corruption which accompanies the arrogance of power. By repeatedly attempting to minimize the severity of his misconduct, and by steadfastly asserting that the IRB and this Court should turn a blind eye to his "minor" infractions, Giacumbo has manifested a continuing disdain toward the rule of law and a lack of respect for the rank-and-file union members that he purports to represent. This Court finds these characteristics intolerable in a Teamsters leader, and thus cautions all Teamsters against holding oneself out as beyond the law's reach and failing to turn square corners in the stewardship of their union. Doing so is the surest route to harsh, enduring penalties.

## *III. CONCLUSION*

IT IS HEREBY ORDERED THAT the findings of IRB Application XXV are AFFIRMED in all respects EXCEPT as to sanctions.

IT IS FURTHER ORDERED THAT the findings of IRB Application XXX are AFFIRMED in all respects, EXCEPT those relating to the IRB's characterization of Theodus' testimony and those relating to sanctions.

IT IS FURTHER ORDERED THAT the findings of IRB Application XXX regarding sanctions are REJECTED.

IT IS FURTHER ORDERED THAT IRB Application XXX is REMANDED TO THE IRB FOR FURTHER CONSIDERATION

consistent with this Court's Opinion and Order.

SO ORDERED.